**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION**

| | | |
|---|---|---|
| **LEWIS E. KNAPPER AND** | § | |
| **LINDA KNAPPER,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION FILE NO: 9:08-CV-84** |
| | § | |
| **SAFETY KLEEN SYSTEMS, INC.;** | § | |
| **ARISTECH CHEMICAL CORP.;** | § | |
| **CHARLOTTE PIPE & FOUNDRY CO.;** | § | |
| **RADIATOR SPECIALTY COMPANY;** | § | |
| **SUNOCO, INC. (R&M); UNITED** | § | |
| **STATES STEEL CORP.; USX CORP.;** | § | |
| **NIBCO, INC. AND OATEY CO.** | § | |
| | § | |
| **Defendants.** | | |

**PLAINTIFF LEWIS E. KNAPPER AND LINDA KNAPPER'S
CONTESTED MOTION TO EXCLUDE JOHN SPENCER'S TESTIMONY**

Plaintiffs Lewis E. Knapper and Linda Knapper respectfully request that this Court enter an Order pursuant to Federal Rule of Evidence 702 excluding Defendant United States Steel Corporation's and Radiator Specialty Chemical Company's expert, John Spencer, from testifying that the half-life of benzene in Liquid Wrench is between two and five minutes. In support of this Motion, Plaintiffs state as follows:

**I. Overview**

This is a products liability and negligence action arising from Lewis Knapper's exposure to toxins and carcinogens, including but not limited to benzene-containing products such as Liquid Wrench supplied and/or manufactured by Defendants. As a result of his exposure to benzene, Mr. Knapper developed acute myelogenous leukemia ("AML").

US Steel designed, manufactured, and marketed a benzene-containing product called raffinate. Utilizing US Steel's benzene-containing raffinate, Defendant Radiator Specialty

Company designed, manufactured, and marketed Liquid Wrench which contained up to 89% raffinate.

Mr. John Spencer was designated as an expert for the Defendants in this case on July 9, 2009. *See* Defendants' Designation of Experts attached as **Exhibit A**. Mr. Spencer's opinions and testimony[1] regarding the evaporation rate of benzene in Liquid Wrench should be excluded for at least the following reasons:

1.  Mr. Spencer's study method is novel and has not been tested;

2.  Mr. Spencer's study method has not been subjected to peer review;

3.  There is no known rate of error; and

4.  Mr. Spencer's study method is not generally accepted in the relevant scientific community.

Mr. Spencer's opinions, therefore, do not meet the standard of admissibility under *Daubert v. Merrell Dow Pharms.¸ Inc., 509 U.S. 579, 592 (1993)*. Accordingly, Mr. Spencer's testimony should be excluded in its entirety.

## II. Applicable Legal Principles

Courts in the Fifth Circuit typically begin their analysis of an expert's testimony by analyzing the factors set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), which include "whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community." *Burleson v. Texas Dept. of Criminal Justice,* 393 F.3d 577, 584 (5th Cir. 2004) (citations omitted).

---

[1] Mr. Spencer's deposition was taken on July 22, 2009. The transcript of his deposition, however, was not available prior to the deadline to file motions to exclude.  Plaintiffs, therefore, reserve the right to supplement the motion to exclude John Spencer's testimony once his deposition transcript becomes available.

Federal Rule of Evidence 702 requires the proffered testimony to be relevant and reliable. *See Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) ("the court must ensure the expert uses reliable methods to reach his opinions, and those opinions must be relevant to the facts of the case."). The trial court must serve as a "gatekeeper" and determine at the outset whether the principles and methodology underlying the expert's testimony are valid. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *see also Daubert*, 509 U.S. at 597.

### III. John Spencer's Experimental Data Is Not Reliable Or Relevant

In June 2009, Mr. Spencer performed a study "to evaluate the rate at which benzene evaporates as a pure substance and from a reformulated product based on the historical production records of the raffinate-containing version of Liquid Wrench manufactured in the 1960 to 1978 timeframe." *See* Spencer Expert Report attached as **Exhibit B** at p. 13. Spencer's study concludes that the evaporation half-life of benzene in Liquid Wrench is on average less than three minutes. *See* Spencer Summary Report attached as **Exhibit C**, at p. 11. Spencer's experimental study and data, however, are unreliable for, at least, four reasons; 1) his study method is novel and has not been tested; 2) his study method has not been subject to peer review; 3) there is no known rate of error; and 4) his study method is not generally accepted in the relevant scientific community.

Dr. Peter Drivas, another expert on behalf of Defendants, testified in his deposition that Mr. Spencer's experimental study and data had not been published.  See Dr. Drivas Deposition Transcript attached as **Exhibit D** at p. 73.  Since the experimental study and data has not been published it has not been subject to peer review.

#### 1.  Mr. Spencer's Experimental Study and Data is Unreliable

Spencer's Summary Report derives the evaporation half-life data for benzene from a "simulated" Liquid Wrench formulation using what he calls a Glove-box Type Evaporation

Chamber ("GBTEC"). Utilizing the GBTEC in such a manner, however, is novel science that has not been tested or generally accepted in the scientific community.  The data collected, therefore, is unreliable.

First, Mr. Spencer's experiment is novel. In his expert report, Mr. Spencer makes no mention of the reason for the choice of a GBTEC apparatus for testing the evaporation rate of a petroleum solvent. Specifically, there is no mention that the technique has been approved by ASTM for this purpose or any reference to scientific literature that has used this approach in a peer reviewed journal. Mr. Spencer also fails to cite to any scientific literature that states that his use of the GBTEC is proper or generally accepted in the scientific community.  For these reasons, the evaporation data acquired by the GBTEC apparatus is suspect.

Second, the results from Mr. Spencer's experiment have not been tested and there is no known rate of error. It does not appear that Mr. Spencer attempted to test the calibrations on the GBTEC to make sure it was accurate.  Mr. Spencer could have easily tested the calibrations on the GBTEC by testing the evaporation rates of pure liquids that have a known range of evaporation. Mr. Spencer could have then compared his results to the published data.  If the GBTEC calibrations and data were accurate, Mr. Spencer's results would have mirrored the data in the published literature.  Mr. Spencer, however, did not test the calibrations of his GBTEC evaporation apparatus.  Mr. Spencer's failure to test the calibrations on his GBTEC renders the data from his experiment untested and inadmissible under *Daubert*.

Moreover, though the benzene mass of Mr. Spencer's experimental model was not accounted for in his expert report, using the conditions indicated in Mr. Spencer's summary report, the benzene mass can be easily calculated. The benzene mass was 804 milligrams.  In the experimental results, however, Mr. Spencer could only account for 360-380 milligrams of benzene.  See Exhibit B at p. 14.  Essentially, more than half of the benzene in Mr. Spencer's

study was lost and was not accounted for.  Accordingly, Mr. Spencer's experimental study and data is not reliable.  Moreover, it has an extremely high rate of error.

Third, the data collected from Mr. Spencer's experiment does not mimic the working environment in which Mr. Knapper worked, rendering the data irrelevant to the case at hand. For example, Mr. Spencer's data does not attempt to provide data for low velocities (e.g. variable air flow), which is important because a plumber like Mr. Knapper works in confined spaces (*e.g.*, under sinks) where ventilation can be poor.  The data Mr. Spencer uses to formulate his opinion does not "fit" the facts of this case and are, therefore, not relevant.  *See Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 279 (5th Cir. 1998).

Fourth, the evaporation rate of benzene from Liquid Wrench that Mr. Spencer arrives at using his experimental model mirrors the calculation Dr. Drivas arrived at using Dr. Drivas' own mathematical calculation.  Dr. Drivas' calculations, which are the basis of a separate motion to exclude, are grossly incorrect and contrary to Dr. Drivas' deposition testimony.  Mr. Spencer's data, therefore, is also grossly incorrect.  Plaintiffs incorporate by reference the arguments made in Dr. Drivas' motion to exclude.

### 2.    Mr. Spencer's "Simulated" Liquid Wrench Formulation Is Not Similar To The Liquid Wrench Mr. Knapper Used

Mr. Spencer was not able to perform his experiment on the Liquid Wrench formulation that Mr. Knapper used because that formulation is no longer being manufactured.  Mr. Spencer, therefore, had to try and recreate the raffinated Liquid Wrench Mr. Knapper used.  In his summary report, Mr. Spencer provided very limited information regarding the simulated raffinated Liquid Wrench. Spencer used Reformulated Penetrating Solvent (RPS) to "simulate" the original Liquid Wrench product (OP). A comparison between Mr. Spencer's reformulated Liquid Wrench (RPS), and the Liquid Wrench that Mr. Knapper used (OP), poses serious questions regarding the validity of EPI's simulated Liquid Wrench formulation for, a number of

reasons.

First, the formulation of the OP product Mr. Knapper used is unknown.  On page 9 of Mr. Spencer's Expert Report, it provides a list of components of the OP product including 12.2 percent of what is called naphthenic oil.  *See* Exhibit B*, at p. 9*.  On page 5 of the Spencer Summary Report, however, Mr. Spencer provides a different composition of the OP product that does not mention naphthenic oil.  *See* Exhibit C *at p. 5.*  Similarly, the OP formulation shown in Table 1 of the Spencer Summary Report does not list the oil content of OP.  *Id. at p. 5, Table 1.*  The sum of its constituent parts in Table 1 is only 70%, 30% of constituents are not identified.  Support document 1 to the Spencer Summary Report provides a partial list of the constituents (USS chemicals –Raffinate formulation) that make up the 30% fraction, but no percent values were assigned to these constituents.

Further, Mr. Spencer's RPS product formulation is not known.  The percent weight listing in Table 1 of the Spencer Summary Report for the RPS product only adds up to 88.3%. *Id.*  The other 12% of the RPS product is never identified.  In summary, the RPS formulation is likely different than the OP formulation used by Mr. Knapper.  Moreover, Mr. Spencer fails to identify and/or quantify the percentages of ingredients used in his RPS product.  The fact that the two products are more than likely different makes Mr. Spencer's data irrelevant to Mr. Knapper's case.  Essentially, Mr. Spencer's data does not "fit" the facts of this case.  *See Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 279 (5th Cir. 1998).

Third, the difference between the OP product and Mr. Spencer's RPS formulation is even more evident when the initial boiling points ("IBPs") of the formulations are compared.  *See* Exhibit C at p. 5, Table 2.  In this table the IBP for the reformulated RSP is 158 °F (70°C) while the IBP of the original OP product is listed as 170 °F (76.7 °C).  *Id*.  United States Steel (USS) lists the IBP of raffinate as ranging from 74-94 °C.  See Exhibit C at Support Document 1.  The

overall differences in boiling points between the USS raffinate and Spencer's RPS is ~12°C(~54°F).  Additionally, the difference between Mr. Spencer's RPS and the OP is 7.3°C (~45°F); greater than the value claimed by Spencer in Table 2 of his summary report. See Exhibit C. In both cases, Spencer's RPS initially boils at temperatures well below that of the OP, which implies it evaporates faster than the original product.

Fourth, though the OP product was not available to be tested there is data available that Mr. Spencer could have used to confirm that his RPS was similar to the OP product.  There is data from Radiator Specialty Company and/or United State Steel Corporation regarding the evaporation rate of the Liquid Wrench that Mr. Knapper used.  That data was readily available to Mr. Spencer.  Mr. Spencer could have tested the evaporation rate of his RPS and compared it to the evaporation rate of the OP.  There is no evidence that Mr. Spencer attempted such an analysis.  In fact, there is no evidence that Mr. Spencer attempted to validate any of the data he compiled from the novel scientific approach he used.

Finally, after the Spencer evaporation test was completed, the remaining RPS sample was apparently dried to a thick residue in approximately ten minutes.  This observation is inconsistent with Mr. Knapper's testimony regarding how long Liquid Wrench stayed on his hands.  More importantly, this observation is inconsistent with Radiator Specialty's own data regarding the evaporation rate of Liquid Wrench.

## IV. Request for Relief

For these reasons, Plaintiffs respectfully asks the Court exclude John Spencer's testimony and grant all other relief the Court deems appropriate.

Respectfully submitted,

**HEARD ROBINS CLOUD BLACK & LUBEL LLP**

/s/ Thao D. Ho
John M. Black
State Bar Number:  24006850
J. Robert Black
State Bar Number:  24040526
Hector G. Longoria
State Bar Number:  00794185
3800 Buffalo Speedway, 5th Floor
Houston, Texas 77098
(713) 650-1200
(713) 650-1400 fax
jblack@heardrobins.com
rblack@heardrobins.com
hlongoria@heardrobins.com

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this motion was served on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(A).  Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5(d) and (e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email, on this the 23rd day of July, 2009.

/s/ Thao D. Ho
Thao D. Ho