**EPI**

8805 Columbia 100 Pkwy
Suite 100
Columbia, MD 21045

(410) 744-0700
FAX (410) 744-2003
www.episervices.com

9 July 2009

Mr. Tim Gray, Esquire
Forman, Perry, Watkins, and Krutz & Tardy LLP
200 South Lamar Street
City Centre Building, Suite 100
Jackson, MS 39201-4099

> **Re:** **Summary Report**
> ***Lewis E. Knapper and Linda Knapper vs. Radiator Specialty et al.***
> ***EPI Project # 29213.***

Dear Mr. Gray:

This report summarizes my opinions regarding issues specifically related to the alleged exposure of Mr. Lewis E. Knapper to benzene as a result of his use of Liquid Wrench products and Safety-Kleen parts washer solvents that were alleged to contain benzene as a component of the product. In the original complaint Mr. Knapper claimed exposures to Liquid Wrench from 1962 to 1979. Liquid Wrench contained a benzene-containing raffinate as one of its constituents from 1960 through 1978.[1,2] It is alleged by Mr. Knapper that his use of Liquid Wrench and Safety-Kleen parts washer solvent is associated with his Acute Myelogenous Leukemia (AML), which was diagnosed on 8 March 2008. Mr. Knapper smoked one half pack of cigarettes per day from 1964 to 1976 according to his deposition testimony.

I have been an industrial hygienist for more than 32 years. Currently, I am President of Environmental Profiles, Inc. (EPI) in Baltimore, Maryland. Formerly, I was with the National Institute for Occupational Safety and Health and led a group of industrial hygienists conducting research for the National Occupational Exposure Survey. As an industrial hygienist for the United States Coast Guard, I conducted thousands of exposure assessments of a wide range of products, including numerous benzene-containing materials. My responsibilities also included the management of the occupational medical monitoring program for the 5th Coast Guard District. I was President of the Chesapeake Section of the American Industrial Hygiene Association (AIHA) and was a member of the national AIHA Product Health and Safety Committee and the Emergency Response Planning Committee. I have also authored the *Health and Safety Audits Manual*, published by Government Institutes, and the *AIHA Hazard Communication Guide*, published by the AIHA. The American Board of Industrial Hygiene certifies me as an industrial hygienist and the Board of Certified Safety Professionals certifies me as a safety professional. My curriculum vitae is appended to this report (Appendix I). Environmental Profiles, Inc. charges $285 per hour plus expenses for my time in preparation and testimony in this matter.

---

1 Complaint

2 Product Date First Sold [RSC 00186 – RSC 00187]



**EXHIBIT**

**B**

Summary Report
Lewis E. Knapper v. Radiator Specialty Company, et al.
EPI Project No. 29213
9 July 2009
Page 2

Executive Summary:

- Applying the plaintiff's industrial hygiene expert's methodology for determining inhalation exposure resulted in a cumulative inhalation benzene exposure of 0.8 ppm-yrs for Mr. Knapper. This cumulative exposure dose was well below the current and former benzene health standards.
- The plaintiff's industrial hygiene expert's methodology for determining dermal dose has not been scientifically validated, is not reliable, nor is it a standard and acceptable industrial hygiene practice for quantifying dermal dose for comparison with the occupational health standard.
- When developing the occupational health standards and guidelines, OSHA and other standard and guideline setting agencies accounted for the dermal route of exposure and used the inhalation route of exposure as the surrogate for both dermal and inhalation exposures.
- The Liquid Wrench product labels met the requirements of the Federal Hazardous Substance Act (FHSA) regulations during the period of time from 1960 to 1978 and conveyed the information necessary for Mr. Knapper to properly manage the hazards of the product.

***Exposure Assessment Methodology***

As a certified industrial hygienist, I rely upon the following basic tools in order to conduct an exposure assessment of personal occupational exposures such as Mr. Knapper's:

1. a characterization of the workplace;
2. a characterization of the job and tasks (including frequency and duration of exposures);
3. a characterization of the products (e.g., volatility, relative toxicity, etc.);
4. a characterization of the relevant safety and health regulations and the associated exposure limits;
5. an appropriate association of tasks, environment, job descriptions and chemical agents with the individual exposures being evaluated;
6. classification of workers into Similar Exposure Groups (SEG's) based on an appropriate association of tasks, environment, job descriptions and chemical agents with the individual exposures being evaluated;
7. use of the accepted air sampling and analytical techniques for occupational exposure to benzene; and,
8. a comparison of the dose with occupational exposure limits to evaluate relative risk.

This process is further defined in the standard industrial hygiene text, *A Strategy for Assessing and Managing Occupational Exposures* and *The Occupational Environment: Its Evaluation and Control.*[3]

3 Mulhausen, John R. and Joseph Damiano. A Strategy for Assessing and Managing Occupational Exposures, 2nd Ed. American Industrial Hygiene Association, Fairfax, VA 1998 and DiNardi, SR. The Occupational Environment – Its Evaluation and Control. AIHA Press, Fairfax, VA 1997.

Summary Report
Lewis E. Knapper v. Radiator Specialty Company, et al.
EPI Project No. 29213
9 July 2009
Page 3

### *Retrospective Exposure Assessment*

The purpose of a retrospective exposure assessment is to determine the exposure scenarios where a worker or group of similar workers were exposed to specific stressors (chemical, physical agents, or biological agents) of concern, the time period of each exposure scenario, and the frequency, duration, and intensity of each exposure. These assessments can encounter many obstacles, such as, a lack of access to the worker, changes to the work environment over time, lack of historical process information, lack of credible sampling data, and complex or incomplete work histories. Modeling techniques may be used to characterize exposure dose when the appropriate information is available.[4]

#### *Retrospective (Historic) Exposure Assessment is Part of the Field of Industrial Hygiene*
o  Retrospective exposure assessment and individual dose reconstruction are tools that have been used by industrial hygienists, epidemiologists, and other health professionals for many years, and are a part of the traditional exposure assessment process.[5,6,7,8]
o  Exposure assessments and retrospective exposure assessments are methods upon which industrial hygienists and other trained experts routinely rely. Industrial hygienists contribute to the development of the information necessary to reconstruct historical exposure dose.

#### *Exposure Assessment Models are used in Standard Industrial Hygiene Practice*
o  Airborne Exposure Assessment for solvent mixtures using the Near field/Far field model has been tested and the results of various studies have recently been published to better determine the reliability of this method.[9,10,11]

### *Retrospective Exposure Assessments can be useful tools to evaluate historic exposures*

Retrospective exposure assessments are useful tools to calculate historic exposures only when the methods employed are standardized and validated, and factors used in the estimates are truly representative of the historic products, work practices, and environmental conditions. OSHA and NIOSH have published standard methods to measure many different solvents in the air. Sampling and analytical error rates have been measured and are reported for each of these methods.[12]

[4] Viet SM, Stenzel MR, Rennix CP, and Armstrong TW, AIHA Guideline 11 – 2008 Guideline on Occupational Exposure Reconstruction. American Industrial Hygiene Association, Fairfax, Virginia. 2008.
[5] Esmen N.A. "Retrospective Industrial Hygiene Surveys" Am. Ind. Hyg. Assoc. J. 40 (1979): 58-65.

[6] Checkaway et al., Industrial Hygiene Involvement in Occupational Epidemiology, Am. Ind. Hyg. Assoc. J. 48 (1987) 515-523.

[7] Baumgarten M, J. Siemiatycki, G. Gibbs, Validity of Work Histories Obtained by Interview for Epidemiologic Purposes, Am. J. Epidem. 118 (4) 1983.

[8] Hemon, et al. Retrospective Evaluation of Occupational Exposures in Cancer Epidemiology: A European Concerted Action of Research, Appl. Occup. Environ. Hyg. 6 (6) 1991.

[9] Nicas M, Plisko MJ, and Spencer JW. "Estimating Benzene Exposure at a Solvent Parts Washer." Journal of Occupational and Environmental Health 3(2006): 284-91.
[10] Spencer, John W. and Plisko, Marc J. 'A Comparison Study Using a Mathematical Model and Actual Exposure Monitoring for Estimating Solvent Exposures During the Disassembly of Metal Parts', Journal of Occupational and Environmental Hygiene, 4 (2007): 253 – 259.

[11] Plisko M and Spencer JW. "Evaluation of a mathematical model for estimating solvent exposures in the workplace." JCHAS (2008):

[12] NIOSH Manual of Analytic Methods is available at http://www.cdc.gov/niosh/nmam/ and includes validated sampling and analytical methods. OSHA validated sampling and analytical methods are available at http://www.osha.gov/dts/sltc/methods/index.html. Information regarding limit of detection, range, and precision; i.e. sampling and analytical error is provided for validated NIOSH and OSHA methods.

Summary Report
Lewis E. Knapper v. Radiator Specialty Company, et al.
KPI Project No. 29213
9 July 2009
Page 4

Standard methods for air sampling and analysis are published, readily available, and widely used.[13] By contrast to air monitoring, the assessment of dermal exposures and dermal dose are not relevant, reliable, or consistent with standard industrial hygiene practice and can not be used to retrospectively evaluate dermal exposures.

> "In comparison to air sampling and even biological monitoring, dermal dosimetry is not a simple or routine procedure. Thus far, its use is limited to research and to specially designed studies. An individual applying dermal dosimeters should be thoroughly trained regarding the placement and retrieval of the dosimeters and recording of observations and other information about the activity. In addition to objective parameters, observed work practices can also have statistically significant important influences on dermal exposure, as observed by Popendorf."[14]

### *Dermal Exposure Assessment is not a standard Industrial Hygiene method for quantifying exposures for comparison with Occupational Exposure Limits.*

- o The tools to quantify dermal exposure to organic solvents such as benzene have not been standardized nor validated and remain in development.[15, 16] Quantitative dermal exposure assessment is not standard practice for industrial hygienists.

- o The dermal estimate relied upon by the plaintiff's exposure assessment expert is based on the penetration rate for a solvent through a person's skin (flux). Flux values for benzene (100% or neat) have no known error rate. The issue is further complicated, because the flux value for a solvent in a product mixture is highly dependent on what other materials are in the mixture, at what relative percentages, and numerous environmental factors (air speed across the surface, temperature, etc).

- o The Occupational Safety and Health Administration (OSHA) considered dermal routes of exposure in the development of the Benzene standard. After addressing dermal exposures in the development of occupational exposure limits for benzene, OSHA set an airborne exposure limit. Rather than add the results of dermal exposure models to measured airborne exposures (acquired through validated, standardized methods), OSHA relied upon airborne concentrations derived from epidemiological studies in order to evaluate workplace exposures to benzene and benzene-containing solvents.

- o There is no dermal exposure limit. A separate dose calculation was not added to the inhalation dose when developing the occupational health standards; i.e., OSHA Permissible Exposure Limit (PEL), American Conference of Governmental Industrial Hygienists Threshold Limit Values (ACGIH TLV®) and the National Institute for Occupational Safety and Health Recommended Exposure Limits (NIOSH REL).

- o OSHA, ACGIH, and NIOSH neither require nor recommend quantifying dermal exposures in specific health standards.

---

13 *Ibid.*

14 OSHA. "Dermal Dosimetry" http://www.osha.gov/SLTC/dermalexposure/dosimetry.html

15 Fiserova-Bergerova V. "Letter to the Editor: RE: Response to Bunge's Letter to the Editor." American Journal of Industrial Medicine 34 (1998): 91.

16 Jakasa I and Kezio S. "Evaluation of in-vivo animal and in-vitro models for prediction of dermal absorption in man." Human & Experimental Toxicology 27 (2008): 281-288.

### *Dermal Flux Models have not been Validated for Solvent Mixtures and are Therefore Unreliable*

Uncertainties in dermal exposure models included the selection of input values for flux (the rate of movement of a fluid through the skin), and other individual specific values such as surface area exposed, exposure duration and exposure frequency. For example, flux can be impacted by the percentage of benzene in the mixture (raffinate-containing formulations of Liquid Wrench were mixtures of multiple chemicals); and the percentage and type of co-solvents (cyclohexane, aromatics, alcohols, or water) [i.e. raffinate-containing Liquid Wrench formulations included toluene, xylenes, ethylbenzene, cyclohexane, methyl cyclohexane and other solvents].

One of the major sources of variability in a dermal exposure model is the percentage of a chemical in a mixture and the other characteristics of the other chemicals in the mixture. The flux values for pure (neat) benzene from four studies varied from 0.1 to 1.85 mg/cm$^2$-hour (an 18 fold variation)[17,18,19,20]. This shows the variability in experimentally derived flux values for pure benzene. For benzene in solvent mixtures such as gasoline the measured flux values ranged from 0.00271 to 0.0626 mg/cm$^2$-hour for gasoline containing 0.39% to 5% benzene, a 23-fold difference[21,22]. Additional studies demonstrated the significant variability in determining the flux value for benzene in hydrocarbon mixtures.[23,24] See Appendix II. Many of the dermal exposure studies have "employed compounds applied to the skin in aqueous or single solvent systems, a dosing scenario that does not mimic occupational, environmental or pharmaceutical exposure where compounds are often exposed with associated solvents, contaminants or specific formulation additives. It is well known that such factors modulate absorption of compounds".[25]

Fiserova-Bergerova (1993) explained that when inhalation is not the primary route of exposure for solvents, the lungs will aid in the excretion of the absorbed solvent. This represents another factor that has not yet been addressed in dermal flux models and is among the reasons why biological monitoring, (collection of blood and/or urine samples), is more representative of total absorbed dose estimates of the amount absorbed into the body.

> "Dermal absorption is affected by other routes of entry of the chemical into the body. The role of the lungs in the exposure to volatile chemicals deserves special attention. Dermal

17  Blank, I.H., and D. J. McAuliffe. "Penetration of Benzene through Human Skin." J. Invest. Dermatol, 85 (1985): 522-526.

18  Franz, TJ. Chapter 5 "Percutaneous Absorption of Benzene." in Advances in Modern Environmental Toxicology. Volume VI – Applied Toxicology of Petroleum Hydrocarbons. Editors: MacFarland, Holdsworth, MacGregor, Call, and Lane. Princeton Scientific Publications, Inc. 1984: 61-70.

19  Hanke, J., T. Dutkiewicz, and J. Piotrowski. 1961. "The Absorption of Benzene through the Skin in Man." Med. Pracy, 12 (1961): 413-426. (OSHA translation and reprint with permission in International Journal of Occupational and Environmental Health, 6 (2000): 104-111.)

20  Loden, M. "The in vitro Permeability of Human Skin to Benzene, Ethylene Glycol, Formaldehyde, and n-Hexane." Acta Pharmacol. et Toxicol., 58 (1986): 382-389..

21  Adami, et al. "Penetration of benzene, toluene and xylenes contained in gasolines through human abdominal skin in vitro." Toxicology in Vitro 20-8 (2006): 1321-1230.

22  Blank, I.H., and D. J. McAuliffe 1985

23  Blank, I.H., and D. J. McAuliffe 1985

24  Bowman A and Maibach HI. "Influence of evaporation and solvent mixtures on the absorption of toluene and n-butanol in human skin in vitro." Annals of Occupational Hygiene 44-2 (2000): 125-135.

25  Riviere, JE and Brooks, JD. "Prediction of dermal absorption from complex chemical mixtures: incorporation of vehicle effects and interactions into a QSPR framework." SAR and QSAR in Environmental Research, 18 (2007):1, 31 – 44.

absorption increases the concentration in venous blood. Consequently, pulmonary uptake is reduced or is replaced by elimination." If the concentration of the mixed venous blood is greater than the concentration of the arterial blood, the pulmonary wash out occurs. "Extensive pulmonary clearance of volatile chemicals reduces their potential for dermal toxicity." They pulmonary wash-out was documented experimentally for methanol and xylene.[26]

The rate of absorption can be dramatically impacted by the volatility of the various components of the mixture. Franz stated, "further work is needed ...to define the role of vehicle (solvents or mixtures other than pure benzene) in controlling percutaneous absorption of benzene."[27] Bowman and Maibach (2000) commented, "Industrial exposure is also often to mixtures and seldom to the neat compound or solvent. If one or several compounds are volatile, evaporative loss of one or several of these can dramatically change the absorption of the others as their relative concentrations are increased. Many organic solvents have a high vapour pressure and can be expected to have a substantial loss through evaporation when non- occluded skin is exposed."[28] For all the reasons noted in this section, benzene occupational health standards and guidelines are not based on dermal dose calculations.

Dermal modeling applied for purposes of calculating exposure dose is not a standardized or accepted industrial hygiene method for evaluating an individual's exposures to volatile mixtures such as Liquid Wrench, Safety-Kleen, or benzene for comparison with established occupational health standards. The degree of uncertainty associated with these models varies widely depending on the input values used to estimate the flux, (the rate at which a substance is absorbed through skin.[29]

### *Specific Reasons for the Lack of Reliability of Dermal Modeling are:*

(1)   The process for modeling dermal exposures has not been validated and there is no reproducible measure of its precision or accuracy. Dermal dose model calculations have no known error rate for pure constituents or solvent mixtures;

(2)   Flux estimates for benzene have no known error rate, no known reliability, and no known reproducibility;

(3)   Dermal flux models are particularly unreliable when evaluating solvent mixtures because the skin barriers do not behave in the same way to a neat (100%) benzene product, as they do to mixtures; and

(4)   Methods to quantify exposures via the dermal route of exposure rely on direct measurement of the chemical of concern or other internal markers of exposure measured in blood or urine utilizing validated methods.

26 Fiserova-Bergerova V. "Relevance of occupational skin exposure." Annals of Occupational Hygiene 37 (1993): 673-685. p. 677

27 Franz, p. 70.

28 Bowman A and Maibach HI. "Influence of evaporation and solvent mixtures on the absorption of toluene and n-butanol in human skin in vitro." Annals of Occupational Hygiene 44-2 (2000): 125-135.

29 OSHA Preamble to the Benzene Standard. Federal Register 52(176): September 11, 1987; pp. 34487-34505.

Summary Report
Lewis E. Knapper v. Radiator Specialty Company, et al.
EPI Project No. 29213
9 July 2009
Page 7

### *Mr. Lewis Knapper's Work History and Alleged Exposure to Liquid Wrench and Safety-Kleen Solvent*

Mr. Knapper started working for his father part-time in New York as a plumber's helper in 1964 when he was 14 years old.  He claimed to work three to four times per month with his father during the school year and three days per week in the summer.  Mr. Knapper described his father as using Liquid Wrench to loosen up bolts and nuts that were rusted.  Likewise, regarding his use of Liquid Wrench Mr. Knapper stated, for "anything that was rusted, I would use Liquid Wrench on."

In the second half of 1966, Mr. Knapper's family moved to Florida.  After completing the eleventh grade in 1968, Mr. Knapper dropped out of high school and became a full time plumber's helper or apprentice plumber.  Mr. Knapper worked five years as a plumber's helper (apprentice) to get his journeyman's plumber license and obtained his master plumber's license in 1999.

Mr. Knapper claimed to have used Liquid Wrench both professionally as a plumber and in his personal endeavors which included repairing lawn mowers, automobiles, and motorcycles.

Mr. Knapper claimed to have used Safety-Kleen parts washing tanks to clean parts starting in 1964 when he was 14 years old  at four locations; Colintonio's home, a friend of Mr. Knapper's; in high school during automotive classes; while employed as a mechanic at the Citgo Service Station; and, at Jackson's Garage.  The last time he used a Safety-Kleen parts washer was in 1967 at Jackson's Garage.

Mr. Knapper lived in New York from 1950 to 1966 and from 1974 to 1976, in Texas 1976 to 1985, and in Florida from 1966 to 1974 and again from 1985 to the present.

Table I includes a summary of Mr. Knapper's job titles and potential exposure to benzene-containing products.

### Table I: Lewis Knapper's Alleged Exposure History to Liquid Wrench and Safety-Kleen Solvents[30,31]

| Approximate Date | Job Location | Job Title | Benzene Containing Products | Alleged Product Use: Frequency & Duration |
|---|---|---|---|---|
| 1962 | New York | Personal time | Liquid Wrench | Used fathers LW on go-carts, bicycles, lawnmowers. |
| 1964-1966 | New York, Plumber's Helper worked with father | Plumber's Helper | Liquid Wrench | School -- 6 hours/month applied LW 2-3 min./month. Summer – 12 hours/month applied LW 10 min./month |
| 1964-1966 | Friend's House named Ronnie (Colintonio) cleaned lawn mower parts, brake parts, and car parts in SK parts washer. | Personal time | Safety-Kleen solvent | Used the parts washer once per week for an hour. |

---

[30] Deposition Testimony of Mr. Knapper taken 13-14 January 2009
[31] Mr. Petty's Outline of Opinions Report, Appendix B, Mr. Lewis E. Knapper Telephone Log Sheet

Summary Report
Lewis E. Knapper v. Radiator Specialty Company, et al.
EPI Project No. 29213
9 July 2009
Page 8

| Approximate Date | Job Location | Job Title | Benzene Containing Products | Alleged Product Use, Frequency & Duration |
|---|---|---|---|---|
| 1964-1968 | New York/Florida - repaired 50 motorcycles | Personal time | Liquid Wrench | 1/8 can per motorcycle |
| 1964-1968 | New York/Florida - repaired 100 lawnmowers | | Liquid Wrench | 1/4 can per lawnmower |
| 1964-1968 | New York/Florida – repaired/rebuilt 6 cars | | Liquid Wrench | Used 2.5 cans personally on one "54 Lincoln – one can per week, 1/2 can on the other 5 cars. |
| 1966 | New York - Citgo Gas Station | Pump attendant, mechanic | Liquid Wrench, Safety-Kleen solvent | Used a can per week of LW. Used parts washer for 1.5 hours every day. |
| 1966 | New York — High school automotive glass class | Student | Safety-Kleen solvent | Used parts washer 30 min./week |
| 1966 | Florida - Jackson's Garage | Mechanic | Liquid Wrench, Safety-Kleen solvent | One can per week LW. Used parts washer 10 hrs./week |
| 1968-1975 | Florida/New York - Plumber's Helper | Plumber's Helper | Liquid Wrench | Two cans LW per house repiping, 4 squirts LW per Kitchen sink, 1/4 oz. per lavatory, 1/8 oz. per tub/shower. |
| 1976 , 6 months | No work, had surgery | | None | none |
| 1976, 6 months | New York – Building Engineer part time for 2 months, back to full time 4 | Building Engineer/Plumber | Liquid Wrench | Used LW for 15 min. per galvanized joint. |
| 1977-1984 | Texas – Plumber various employers and independent | Plumber | Liquid Wrench | Used one can LW per week up to early 1980s. |
| 1985+ | Florida – Plumber various employers and independent | Plumber | None | None |

### Ronald Coleman Co-worker Testimony

Mr. Ronald Coleman was a plumber and first met Mr. Knapper in April of 1979 when he moved from New York to Houston, Texas. They were both working at the same job installing copper and sanitary piping, and final fixtures, e.g. toilets, sinks, water heaters, lavatories, tub/showers, washing machine, etc. This work was all new construction. Mr. Coleman recalled seeing Mr. Knapper use Liquid Wrench on a 1955 Chevy, and on his van, and motorcycle. The only other time Mr. Coleman recalled seeing Mr. Knapper use Liquid Wrench was on a renovation job, where he was using the Liquid Wrench to break loose nuts on faucets, sinks and toilets.

Mr. Coleman testified that when he used Liquid Wrench, he would wait from 30 seconds to five minutes before attempting to remove the rusted or frozen fitting. He indicated that the longer you wait, the more effective the Liquid Wrench would be. Mr. Coleman stated that when he would apply Liquid Wrench to a toilet bowl, he would do another task to allow the Liquid Wrench to do its job and thereby make the best use of his time. This method of using Liquid Wrench is consistent with the design of the product, which is to apply the Liquid Wrench and wait for a period of time before attempting to remove the fitting.
Mr. Coleman stated that he brought four or five cans of Liquid Wrench with him when he first moved to Texas in December of 1978. He did not purchase any Liquid Wrench in Texas and stated that the four or five cans lasted him into the mid-1980s. Therefore, these five cans of Liquid Wrench lasted Mr. Coleman for approximately six years. Mr. Coleman's usage of

Summary Report
Lewis E. Knapper v. Radiator Specialty Company, et al.
EPI Project No. 29213
9 July 2009
Page 9

Liquid Wrench would have been estimated at less than one can per year as compared to Mr. Knapper's use of Liquid Wrench of one can per week as a plumber.

### Description of the Raffinate-Containing Liquid Wrench Product

Liquid Wrench was a penetrant designed to aid in the loosening of metal on metal joints that are difficult to get apart. Testimony by Mr. Knapper indicated that Liquid Wrench was applied to bolts and fittings that were difficult to remove, and then allowed to soak in for a period of time (few minutes to 15 minutes)[32] before attempting to remove the bolt or fitting.

The Liquid Wrench product had several different formulations, which were typically sold in four (4), eight (8), and 16-ounce drip cans depending on the time period. After approximately 1971, the four (4) ounce cans were available only in the non-raffinate formula. Raffinate is a coal derivative that contains varying solvent constituents. Table II lists the components of the raffinate-containing and non-raffinate containing Liquid Wrench products.[33] The raffinate-containing Liquid Wrench product was manufactured for approximately 18 years between 1960 and 1978.[34] Non-raffinated Liquid Wrench (referred to as "deodorized") was also available during this same time period. Liquid Wrench products that did not include raffinate also did not include benzene.[35] Both Liquid Wrench formulations contained oil which resulted in an "oily" feel to the product.

### Table II: Components of Liquid Wrench
(formulations with and without raffinate)[36, 37]

| Components | % Content in Raffinated Liquid Wrench | % Content in Deodorized Liquid Wrench |
|---|---|---|
| Kerosene | -- | 89.2 |
| Ba Sulfonate | -- | 0.45 |
| Na Sulfonate | -- | 0.36 |
| Mineral Seal Oil | -- | 8.8 |
| Odorant | 1.15 | 1.07 |
| Graphite Disp. | 0.32 | 0.12 |
| Naphthenic oil | 12.22 | -- |
| Raffinate (components as % in the final product) | | -- |
| Benzene | 4.39 | |
| Toluene | 5.25 | |
| o-Xylene | 1.76 | |
| m-Xylene | 6.15 | |
| p-Xylene | 2.6 | |
| Ethyl Benzene | 4.39 | |
| Cyclohexane | 19.3 | |
| Methylcyclohexane | 10.5 | |
| Aliphatic & Aromatic HC | Approx. 32 | |

---

32 Deposition of Lewis Knapper taken 13 January 2009, pgs 23-26

33 Safety Data Sheet for Raffinate, USS Chemicals, 1967.

34 Table P-4 Typical Analysis of Chariton Raffinate [USS 09 – USS 10], and Appendix No. 2 to LR-09A "Liquid Wrench No.1 [RSC 00025]

35 Product label exhibit 17 Wells deposition

36 Table Y (Attachment to LR-09-A) Properties of raffinate (D-3) [Bate #RSC00023]

37 Appendix No. 2 to LR-09A: Liquid Wrench No. 1, Formules in %/Weight [Bate # RSC00160]

Summary Report
Lewis E. Knapper v. Radiator Specialty Company, et al.
EPI Project No. 29213
9 July 2009
Page 10

*Raffinate-Containing Liquid Wrench Product Label*

The Federal Hazardous Substances Labeling Act of 1960, modified in 1966 changed the name of the Act to Federal Hazardous Substances Act (FHSA) and included provisions of child precautionary labeling. Also, in 1964, Congress delegated the regulation of benzene-containing consumer products to the FHSA. See Table III for the regulations as they pertain to the Liquid Wrench products.

According to testimony[38] by James Wells, who worked with Radiator Specialty Company, Liquid Wrench container labels included all necessary information and met the requirements of the FHSA from the time he joined the company in 1972 forward and historically as well. Based upon his review of available product labels for the raffinate-containing Liquid Wrench product, the labels contained the necessary warnings recommended by labeling guidelines and regulatory authorities for each time period.[39] Labels indicated the presence of 'benzol" (i.e. benzene), the appropriate signal words i.e. danger, and skull and crossbones symbol.

*Consumer Product Safety Regulations*
**TABLE III:  Label for Liquid Wrench (Raffinate-containing) Compared to Federal Labeling Regulations**

| Hazardous Substances Act[39] | Label Contents[40] | Comments |
|---|---|---|
| Applies to consumer products that are "intended or packaged in a form suitable for use in the household." Cautionary labeling for substances defined as hazardous under FHSLA include the following: | Labeling was on the front and back of the Liquid Wrench can. | Liquid Wrench was sold in hardware, auto parts and department stores. |
| Name and place of business of the manufacturer, packer, distributor or seller | Radiator Specialty Company Charlotte, NC 28201 | Meets U.S. product labeling requirements 1960 to 1972. |
| Common or Usual name or the chemical name of the hazardous substance… | Liquid WRENCH | Common name. |
| The signal word "DANGER" on substances which are extremely flammable, corrosive or highly toxic. The word 'poison' for any hazardous substance which is defined as 'highly toxic.' | SIGNAL WORD:  "DANGER – POISON"** | In 1962, the consulting company, Foster Snell, determined that based on the results of their testing, that raffinate-containing LW met the definition of "Hazardous" under the law. |

---

38 Deposition of James Wells, taken 7 December 2006

[39] Based on the 1960 Federal Hazardous Substances Labeling Act of 1960 as modified in 1966. Major changes included a change in the name of the Act to Federal Hazardous Substances Act and provisions of child precautionary labeling. Also, in 1964, Congress delegated the regulation of benzene-containing consumer products to the FHSA in a February 1964 Federal Register Notice (pages 1802-1803) Currently, CPSC requires consumer products containing benzene at levels of five percent (5%) or more by weight to include the statement "… inhalation of the vapors of products containing 5% or more by weight of benzene may cause blood dyscrasias…" 16 CFR 1500.14(b)(3)(i).
[40] "The label declarations must be located prominently, in the English language, in conspicuous and legible type." [FHSLA 1960]

| Hazardous Substances Act | Label Contents[16] | Comments |
|---|---|---|
| "Because inhalation of the vapors of products containing 5 percent or more benzene may cause blood dyscrasias, such products shall be labeled with the signal word "danger," the statement of hazard: Vapor harmful," and the word "poison," and the skull and crossbones symbol. [FR 6 February 1964 p 1802-3] | SYMBOL: "Skull and Crossbones" | Skull and crossbones symbol was appropriate for the raffinate-containing LW product, but not for other LW formulations. |
| Precautionary measures describing the action to be followed or avoided.\n\nThe statement 'Keep out of the reach of children,' or its practical equivalent. | PRECAUTIONARY MEASURES: "CAUTION: Contains Benzol. Use only with adequate ventilation. Avoid prolonged or repeated breathing of vapor and contact with skin. Harmful of ingested. Keep out of reach of children" | 1966 amendments to the Federal Hazardous Substances Act required provisions of child precautionary labeling. |
| Instructions for handling and storage of packages which require special care in handling or storage.\n\nAn affirmative statement of the principal hazard, such as 'flammable' 'vapor harmful,' 'causes burns,' 'absorbed through skin,' or similar wording descriptive of the hazard. | Flammability Warning: "CAUTION – FLAMMABLE MIXTURE, DO NOT USE NEAR OPEN FIRE OR FLAME" "FLAMMABLE VAPOR HARMFUL HARMFUL or FATAL IF SWALLOWED"** | The signal word caution is applied to the level of flammability of the product. FHSA regulations would also call for the use of the CAUTION – NOTE: "Any article that presents more than one type of hazard (for example, if the article is both "toxic" and "flammable") must be labeled with an affirmative statement of each such hazard…" [21 CFR 191.107, 1964] |
| Instruction, when necessary or appropriate, for First Aid treatment. | "FIRST AID: Call Physician immediately if contacted with skin, wash thoroughly, for eyes flush gently 15 minutes. Acute vapor exposure, immediately move to fresh air – keep quiet. If breathing has stopped, begin artificial respiration. If swallowed, do not induce vomiting."** | Standard First Aid language was applied based on the definitions of health hazards in FHSA and the use of standard phrases at the time. |

** In the special case of petroleum distillates, "…in addition to oral toxicity resulting in systemic poisoning, are hazardous because of aspiration into the lungs with resulting chemical pneumonitis, pneumonia, and pulmonary edema, the signal word "danger" is specified. The statement of hazard shall include "Harmful or fatal if swallowed" For Kerosene and related petroleum distillates, the label shall also bear the statement, "If swallowed, do not induce vomiting."

## Liquid Wrench Worker Exposure Studies

### EPI Study: An Evaluation of Benzene from the Application and Use of a Prepared Liquid Wrench Solvent in Static Environmental Conditions

The generation of airborne benzene vapor from a solvent is dependent on many factors including the vapor pressure of the solvent components, as well as environmental conditions such as temperature, relative humidity and ventilation.  In order to quantify the likely exposures to benzene of workers using Liquid Wrench, EPI performed a study in August 2002 to evaluate the exposure of a worker and a helper to Liquid Wrench containing various weight concentrations of benzene (see Appendix III – *"Exposure Assessment: An Evaluation of Benzene from the Application and Use of a Prepared Liquid Wrench Solvent in Static*

Summary Report
Lewis E. Knapper v. Radiator Specialty Company, et al.
EPI Project No. 29213
9 July 2009
Page 12

*Environmental Conditions.*")  In order to evaluate these exposures, three batches of Liquid Wrench were spiked with known weight percentages of benzene.  Specifically, preparations of the Liquid Wrench/benzene (LW/benzene) solution were made in 1%, 7% and 30% concentrations by weight.

Three valve assemblies, each containing at least three flanges with rusted bolts and nuts were used during the study.  For each of the three valve assemblies, Liquid Wrench containing 1%, 7% and 30% benzene was used to free the bolts and nuts on the flanges.  Each weight percentage of benzene in Liquid Wrench was used for a period of two hours.

Personal and area air monitoring for benzene were completed on the worker and helper during each two-hour trial where each Liquid Wrench/benzene weight concentration was used.  In addition to the two-hour sampling periods, 15-minute personal breathing zone samples were also obtained.  The workplace ventilation was measured during the study and found the air movement to be between zero and six feet per minute (fpm), which was representative of static ventilation conditions.

Table IV provides a summary of the air sample results.  Based upon the work environment where Mr. Knapper may have used Liquid Wrench, his likely exposure, if any, to benzene while using the Liquid Wrench would have been at or below the exposure concentrations reported above in the EPI study (static conditions).

**Table IV: Summary of Worker Time Weighted Average (TWA) exposure levels measured in exposure reconstruction study using Liquid Wrench Product spiked with three different concentrations of benzene.**

| Sample Location | % Benzene in Liquid Wrench Solution | 2-hr TWA (ppm) | Range of 15-minute STEL averages (ppm) | Calculated 8-hr TWA (ppm) |
|---|---|---|---|---|
| Worker | 1 | | 0.87 – 1.1 | 0.179 |
| Helper | 1 | | .024 – 0.27 | 0.035 |
| Area | 1 | 0.10 – 0.11 | | |
| | | | | |
| Worker | 7 | | 1.15 – 4.87 | 0.351 |
| Helper | 7 | | 0.24 – 0.92 | 0.060 |
| Area | 7 | 0.301 – 0.319 | | |
| | | | | |
| Worker | 30 | | 1.88 – 3.51 | 0.585 |
| Helper | 30 | | 0.23 – 2.1 | 0.160 |
| Area | 30 | 0.14 | | |

Summary Report
Lewis E. Knapper v. Radiator Specialty Company, et al.
EPI Project No. 29213
9 July 2009
Page 13

### *EPI Study: Determination of Evaporation Rates for Benzene and a Benzene-Containing Solvent Mixture*

EPI performed a study in June of 2009 to evaluate the rate at which benzene evaporates as a pure substance and from a reformulated product based on the historical production records of the raffinate-containing version of Liquid Wrench manufactured in the 1960 to 1978 timeframe. (see Appendix IV – *"Determination of Evaporation Rates for Benzene and a Benzene-Containing Solvent Mixture."*) The generation of airborne benzene vapor from a solvent is dependent on many factors including the vapor pressure of the solvent components as well as environmental conditions such as temperature, relative humidity and ventilation. EPI performed this study in order to determine the benzene content in a solvent mixture at a specific time after product dispensing and to determine the average concentration of benzene in the liquid mixture over a specified period of time once dispensed.

A total of 12 test trials were conducted over the three-day study period. Three (3) trials were conducted on each of the three days at chamber air speeds of approximately 27 feet per minute (fpm) and one (1) trial was conducted at a chamber air speed of approximately 50 feet per minute. Continuous sampling of solvent vapors was performed for the duration of each trial via the ChemSense 600 Mass Spectrometer unit. Additionally, 12 charcoal tube air samples (one per trial) and 18 Summa canister samples were collected and analyzed for benzene. Two (2) Summa canister samples were obtained per 27 fpm trial.

A ChemSense 600 Ion-trap mass spectrometer recorded the benzene mass concentration during each evaporation trial, which was subsequently converted to the cumulative mass of benzene evaporated per unit time. The half-life point of the evaporation period was also calculated. For Day 1 (evaporation of 20 ml of benzene from the surface of a glass plate) the average pure benzene evaporation time for Trials 1 through 3 was approximately 30 minutes with an average half-life point of less than eight (8) minutes. For Day 2 (evaporation of 20 ml of reformulated product containing 5.1% w/w benzene from a glass plate) the average benzene evaporation time for Trials 1 through 3 was approximately 12 minutes with an average half-life point of less than three (3) minutes. For Day 3 (evaporation of 20 ml of reformulated product containing 5.1% w/w benzene from simulated product use) the average evaporation time for Trials 1 through 3 was approximately 11 minutes with an average half-life point of less than three (3) minutes. Table V contains a summary of the Day 3 benzene half life data.

**Table V: Time for Half of the initial Mass of Benzene to Evaporate**

| Trial Run | Half-life Time (min.) |
|---|---|
| Day 2, Trial 1 (20 ml LW on plate) ~ 27 fpm | 3.05 |
| Day 2, Trial 2 (20 ml LW on plate) ~ 27 fpm | 2.76 |
| Day 2, Trial 3 (20 ml LW on plate) ~ 27 fpm | 2.67 |
| Day 3, Trial 1 (20 ml LW on part) ~ 27 fpm | 2.79 |
| Day 3, Trial 2 (20 ml LW on part) ~ 27 fpm | 3.46 |
| Day 3, Trial 3 (20 ml LW on part) ~ 27 fpm | 1.76 |
| Mean | 2.67 |
| | |
| Day 2, Trial 4 (20 ml LW on plate) ~ 50 fpm | 1.99 |
| Day 3, Trial 4 (20 ml LW on gloves) ~ 27 fpm | 1.94 |

Summary Report
Lewis E. Knapper v. Radiator Specialty Company, et al.
EPI Project No. 29213
9 July 2009
Page 14

Figure 1 depicts the cumulative mass of benzene from evaporation of 20 ml of reformulated product containing 5.1% w/w benzene from simulated product use. It should be noted that the Liquid Wrench was not dispensed onto the part until 1.78 minutes after the ChemSense 600 mass spectrometer started recording. Therefore, the time values depicted in the graph should have 1.78 minutes subtracted. Trials 1-4 were completed at an air speed rate of approximately 27 fpm. However, Trial 4 (1.94 minutes) fell in the range of 1.76 minutes to 3.46 minutes of the other three trials involving the evaporation of Liquid Wrench from the parts and gloves.



Figure 1: Depicts mass loss of benzene over time from application of Liquid Wrench on Parts for Trials one (1) through three (3). Trial four (4) Involved Liquid Wrench evaporating from application to gloves.

### Description of the Safety-Kleen Parts Washer

Mr. Knapper described his first use of the Safety-Kleen parts washer when he was 14 years old at the Colintonio's house. He stated there were no labels or signs on the parts washer indicating it was a Safety-Kleen parts washer. Mr. Knapper believed it to be a Safety-Kleen parts washer because it looked like other Safety-Kleen parts washers he had seen at gas stations, only older. Mr. Knapper never saw anyone add solvent to this parts washer but stated he knew his friend's father would bring home cans of solvent from work and add that to the parts washer. Mr. Knapper used this parts washer one hour per week for approximately 6 weeks.

Mr. Knapper claimed to have used a Safety-Kleen parts washer while in high school. He stated the parts washer had a black and silver plate that said Safety-Kleen on it. This parts washer had an "SC" symbol on the back of the hood. Mr. Knapper claimed he had drained this parts washer from time to time but never refilled it. He used the parts washer for 30

minutes per week and claimed he would get solvent all over his hands, which subsequently ran down his arms. He would wash his hands at the end of shop class.

Mr. Knapper stated that he used a Safety-Kleen parts washer while employed at the Citgo Gas Station for about nine months in the 1965/66 timeframe. He claimed he used the parts washer two to three hours per week during school and five to six hours per week in the summer. He described the parts washer in the same manner as at his friend's house, the high school, and the one at Jackson's Garage. He claimed to use the parts washer two to three hours per week during the school year and five to six hours per week in the summer.

Mr. Knapper stated in his deposition testimony that he used a Safety-Kleen parts washer at Jackson's Garage for about one year in 1966. In the telephone conversation with Mr. Petty, he stated that he worked for Jackson's Garage for about 6 months in 1967. He claimed he used the parts washer two to three hours per week in his deposition taken on 14 January 2009 and ten hours per week in his deposition taken on 13 January 2009. He believed this parts washer to be Safety-Kleen because it looked like all the other parts washers he had seen.

### Plaintiff's Industrial Hygiene Expert's Report

Mr. Steven E. Petty has attempted to quantify Mr. Knapper's cumulative exposure to benzene over his working lifetime from the use of Liquid Wrench, Safety-Kleen solvents, and smoking of cigarettes. Mr. Petty did not quantify any benzene exposure due to other potential benzene-containing products that Mr. Knapper may have used throughout this time period.

Mr. Petty's approach to quantifying Mr. Knapper's historical exposure to benzene from Liquid Wrench was based on two routes of exposure: inhalation and dermal.

#### Mr. Petty's Inhalation Methodology

In order to calculate Mr. Knapper's inhalation exposure, Mr. Petty needed to estimate the concentration of benzene in the worker's air in parts per million (ppm) and determine the time of exposure in years resulting in a value of ppm-years. To determine the airborne concentration, Mr. Petty utilized the near field/far field model where in this case the far field component was not factored into the final assessment. The near field is defined as the zone immediately surrounding the individual. In cases where there is basically a single point source for the contaminant to be released into the breathing zone (near field), a hemisphere is normally used to represent the breathing zone of the individual with a radius of arms length of 0.78 meters (2.5 feet).[41] The concentration within that hemisphere is a function of the generation rate of the contaminant and the air movement in and out of that hemisphere. Mr. Petty assumed an air speed of 37.5 fpm through the near field.

Mr. Petty used a radius of the near field of less than half a meter (0.457m) based upon the conversation he had with the plaintiff. According to the telephone log, the plaintiff claimed to

---

[41]Keil, C. B., "Mathematical Models for Estimating Occupational Exposure to Chemicals," AIHA, 2000 pg 53.

Summary Report
Lewis E. Knapper v. Radiator Specialty Company, et al.
EPI Project No. 29213
9 July 2009
Page 16

have been between 6 inches to 18 inches away from the Liquid Wrench wetted materials. Mr. Petty assumed all the benzene in the Liquid Wrench evaporated into the air less the amount of benzene that was absorbed via his dermal flux model. Based on his conversation with Mr. Knapper, he assumed a post application wet time of two hours. This resulted in all the benzene evaporating from the solvent following the product application after approximately two hours to two hours and 25 minutes.

Mr. Petty calculated the generation rate of benzene evaporating from the Liquid Wrench by dividing the mass of benzene available to evaporate by the cumulative time of each event.

### Mr. Petty's Dermal Methodology

To calculate the dermal exposure, Mr. Petty utilized a dermal flux model. This model calculated the amount of benzene absorbed through the skin based on a flux value (the amount of material that absorbs through the skin per the amount of surface area exposed per unit of time). As noted in this report dermal dose calculations are not added to inhalation dose calculations for comparison with occupational health standards, i.e., the OSHA PEL.

Even if dermal flux exposure estimation models had been validated, Mr. Petty's development of an equation to predict flux values for mixtures containing variable volumes of benzene has not been validated, has no known error rate and is therefore unreliable. This approach does not address the differences in exposures based on personal factors (individual differences) nor does it address factors associated with the exposure environment (environmental factors such as temperature, airflow across the skin surface, etc.). Most significantly, Mr. Petty's equation does not reflect the differences in flux based on the solvent (product) vehicle or combination of other chemicals in the mixture, especially as it effects permeation and evaporation rates.

Mr. Petty selected a few measurements from four studies[42,43,44,45] while ignoring other studies.[46,47,48] Furthermore, he omitted some data points in the studies he quoted. Inclusion of the omitted values changed the equation. Even if the equation accurately reflected the available data or was censored in a scientifically and statistically valid manner, Mr. Petty's equation yielded values that differ from experimentally derived values from 9% to more than 1,000%, see Appendix V. I used the Blank and McAuliffe (1985) data to perform this simple reality check. As Table VI demonstrates, Mr. Petty's equation was used to estimate flux values for four solutions each containing five percent (5%) benzene. Blank and McAuliffe reported experimental values for each of these five percent benzene mixtures. The Blank and McAuliffe article demonstrated the statistical unreliability of determining flux values for benzene in solvent

42 Hanke et al 1961.

43 Fiserova-Bergerova V and Pierce JT. "Biological Monitoring V: Dermal Absorption." Applied Industrial Hygiene, 4 (1989): F-14 - F-21.

44 Blank, I.H., and D. J. McAuliffe. "Penetration of Benzene through Human Skin." J. Invest. Dermatol, 85 (1985): 522-526.

45 Susten, et. al. "Percutaneous Penetration of Benzene in Hairless Mice: an Estimate of Dermal Exposure During Tire Building Operations." American Journal of Industrial Medicine, 7 (1985): 323-335.

46 Adami, et al. "Penetration of benzene, toluene and xylenes contained in gasolines through human abdominal skin in vitro." Toxicology in Vitro, 20 (2006): 1321-1230.

47 Franz 1984.

48 Loden, M. "The in vitro Permeability of Human Skin to Benzene, Ethylene Glycol, Formaldehyde, and n-Hexane." Acta Pharmacol. et Toxicol., 58 (1986): 382-389.

mixtures. Mr. Petty used the Blank and McAuliffe study without regard for the scientific
limitations of such data.

**Table VI: Comparison of Experimentally Measured Values and Petty Predictions**

| Reference | % Benzene in Mixture | Flux predicted by Petty Equation | Measured Flux Reported in Study $(mg/cm^2-hr)$ | Percent Error |
|---|---|---|---|---|
| Blank and McAuliffe, 1985 | 5% in gasoline | 0.05155 | 0.062 | 16.9% |
| Blank and McAuliffe, 1985 | 5% in hexadecane | 0.05155 | 0.047 | 9.7% |
| Blank and McAuliffe, 1985 | 5% in hexane | 0.05155 | 0.105 | 50.9% |
| Blank and McAuliffe, 1985 | 5% in isooctane | 0.05155 | 0.187 | 72.4% |

* Petty, Stephen. Outline of opinions Liquid Wrench benzene exposure Lewis E Knapper Case prepared for Heard Robins Cloud & Lubel, LLP, May 20, 2009 p. 31. Eq. (7-5) $Flux_b = 0.0183$ (% Benzene Conc.)$^{0.6415}$ based on based on six (6) values from four (4) articles: Hanke et al 1961, Fiserova-Bergerova 1989, Blank et al 1985, and Susten et al 1985. Note isooctane value from Blank and McAuliffe was not included in Petty estimate.

$$\text{Percent error} = \frac{|\text{value} - \text{value}_{approximate}|}{|\text{value}|} [49]$$

### Mr. Petty's Assumptions regarding Mr. Knapper's Exposure to Liquid Wrench

Mr. Petty assumed the duration of exposure to Liquid Wrench was between approximately two
hours and two hours and 25 minutes per event (application time plus two hours of wet time).
The basis of Mr. Petty's assumption is as follows, "An ETpa value [time wet after application] of
2 hours was used throughout the time he used Liquid Wrench based on the average of 0 – 4 hours
of time before lunch or when he likely washed at home." According to Mr. Petty's telephone
log, "Mr. Knapper indicated in Appendix B [Petty Report] that product stayed on his hands until
it dried." Mr. Knapper described the feeling of Liquid Wrench in his hands in his deposition
taken 13 January 2009 as, "It was cool. It seemed like it was in—it would evaporate fast, and it
would dry on my hands, chap them up." The plaintiff's description of Liquid Wrench
evaporating fast contradicts Mr. Petty's assumption that the benzene in the Liquid Wrench would
remain wet on Mr. Knapper's skin for over two hours for each application or event.

The number of events for each work activity, assumed by Mr. Petty was taken either from the
telephone log of the plaintiff, or was assumed to occur once per week for certain employer based
activities. The duration in years or months was taken from the telephone log of the plaintiff.

Mr. Petty assumed all the Liquid Wrench that Mr. Knapper used during his lifetime was the
raffinated version of this product. According to Mr. Knapper's deposition testimony, he used
only the eight ounce drip cans of Liquid Wrench. He recalled seeing a skull and crossbones on
some of the cans of Liquid Wrench that he used. These Liquid Wrench cans would have been
the raffinated version of Liquid Wrench according to James Wells, corporate representative for

---

49 Golub, Gene, Charles F. Van Loan (1996). Matrix Computations - *Third Edition*. Baltimore: The Johns Hopkins University Press, pp. 53.

Radiator Specialty.[50] Mr. Knapper also identified a can of Liquid Wrench that did not contain the skull and crossbones as a Liquid Wrench product he used. This Liquid Wrench can would have been the non-raffinated version of Liquid Wrench.[45] Mr. Knapper could not delineate how much of the raffinated version versus the non-raffinated version of Liquid Wrench he used in the 1960s and 1970s.[51] Therefore, if Mr. Knapper used the non-raffinated version of Liquid Wrench for some of the applications in the 1960s and 1970s, Mr. Petty's estimate of Mr. Knapper's exposure to benzene would have been overestimated.

### Mr. Petty's Assumptions Regarding Mr. Knapper's Dermal Exposure to Liquid Wrench

When evaluating Mr. Petty's evaporation rate of benzene in Liquid Wrench for the dermal exposure, his average concentration of benzene in Liquid Wrench for the two hour time frame after the application of Liquid Wrench was 3.1% (v/v). This is more than 50% of the of the original benzene concentration in Liquid Wrench from the time Mr. Knapper would apply the product.

Mr. Petty assumed no evaporation of benzene from the Liquid Wrench during the application period of approximately five (5) minutes to 25 minutes. He then applied an exponential evaporation rate constant[52] to determine the average benzene concentration in Liquid Wrench over the next two hours that would be on Mr. Knapper's skin. The basis for this evaporation rate constant that Mr. Petty used is not scientifically reliable. To arrive at this evaporation rate constant, Mr. Petty plotted an exponential decay curve from benzene evaporating from the Exxon Valdez crude oil spill in Alaska. The air and water temperature were approximately 3 degrees centigrade (37 degrees Fahrenheit). He plotted the evaporation rate curve for crude oil and for gasoline and concluded that benzene evaporated from crude oil at a different rate than crude oil or gasoline.

Mr. Petty plotted a curve based upon the evaporation rate for Liquid Wrench and compared that to the evaporation rate for gasoline and for crude oil and concludes that Liquid Wrench evaporated faster than crude oil and slower than gasoline. Mr. Petty then concluded that the rate at which benzene evaporated from Liquid Wrench would be the average of the half-life of crude and the half-life of gasoline. He then took this value to calculate the alpha for benzene evaporating from Liquid Wrench. The evaporation rate of a compound such as benzene as compared to the evaporation rate for a mixture are two distinct independent scenarios.

Evaporation rates of benzene from a solvent mixture are dependant on various factors such as air speed, surface area exposed, amount of benzene in mixture, temperature of the solvent mixture, the other constituents in the mixture (van der Waals forces), and many other factors. To calculate the percentage of benzene lost or remaining in the solution over a period of time depends on the above factors including the mass of the solvent and the thickness of the solvent

---

50 Affidavit of James D. Wells, signed 14 October 2008.

51 Deposition of Lewis Knapper, taken 14 January 2009, pgs. 82-84

52 Mr. Petty obtained an exponential evaporation rate constant, α, from averaging the evaporation rate he obtained from benzene evaporating from crude oil and the evaporation rate of gasoline.

dispersion. Mr. Petty applied his evaporation rate constant to determine what the average percent concentration of benzene would be over the post application period of two hours but does not take into consideration these factors in making his evaporation rate calculation. Therefore his benzene concentration in Liquid Wrench is unreliable.

Mr. Petty assumed that Mr. Knapper made dermal contact with the Liquid Wrench immediately upon the dispensing of the product. He assumed that the Liquid Wrench would have covered the entire right hand surface area, front and back and at least one-half of the surface area of the left hand, plus part or all of the wrist surface area immediately upon the dispensing of the product every time Mr. Knapper used Liquid Wrench. Mr. Petty also assumed that the contacted areas would remain wet for an additional two hours after the dispensing of the Liquid Wrench. Based on the normal and typical use of Liquid Wrench, a worker would not cover the entire surface area of the palms, fingers, and back of the hand every time they used the product.

Mr. Knapper testified that he would get Liquid Wrench on his hands; However, the amount of Liquid Wrench he would get on his hands would vary. He also stated when he used the Liquid Wrench on his bike, he would get Liquid Wrench only on the front side of his hands. Testimony from a worker in another case who used Liquid Wrench stated that he got Liquid Wrench on his hands less than 50% of the time when he used the product. When he did get Liquid Wrench on hands, it would be only on the fingers and palms of his hands. Another worker that used Liquid Wrench stated that he may have gotten a drop or two on himself, but he explained that normally one could use Liquid Wrench and not get any on their hands at all. This worker also testified that he never got Liquid Wrench all over the palm of his hand or on all five fingers.[53]

As indicated in his testimony, Mr. Knapper did not get Liquid Wrench immediately upon dispensing the liquid over all the surfaces areas as depicted by Mr. Petty. There may have been occasions where Mr. Knapper did get Liquid Wrench over the skin surface area as outlined by Mr. Petty. However it would not have happened every time and when it did happen it would have been most likely after the waiting period to allow the Liquid Wrench to work before handling the product. Testimony by Mr. Knapper indicated that he would apply the Liquid Wrench and wait up to 15 minutes before attempting to remove the bolts or fittings.[54] During this delayed time period, most if not all of the benzene would have evaporated from the Liquid Wrench thereby reducing, or eliminating the potential absorption of the benzene through the skin. Mr. Petty's assessment of the dermal absorption is a significant overestimation of exposure dose.

It is not logical for someone to get Liquid Wrench on both hands and try to remove bolts using a wrench since the Liquid Wrench has an oil base, making the wrench slippery and difficult to hold. If a worker did get Liquid Wrench on his hands, generally, the worker would wipe his hands to remove as much of the Liquid Wrench as possible. According to Mr. Coleman, a co-worker of Mr. Knapper, he believed that Liquid Wrench was oily. When asked when he got Liquid Wrench in his fingertips, did he wipe it off to get a better grip, Mr. Coleman responded, "We always carried rags with us for that purpose. Yes." Mr. Coleman said that Mr. Knapper

53 Deposition of Robert Burton, taken 19 Sept 2008 and Deposition of Edson Burnham, taken 2 Oct 2008 in the Robert B. Oakley and Irene Oakley v. Radiator Specialty, Case Number 2:07-CV-00351.

54 Deposition of Lewis Knapper, taken 13 January 2009, pgs. 24-26.

carried rags for that purpose also.[55]  If Mr. Knapper wiped his hands to remove as much of the Liquid Wrench as possible when he got it on his hands, the duration of exposure and resulting calculated absorbed dose would be less than what Mr. Petty's two (2) hour plus dermal exposure assessment predicted.

Regarding the surface area of the average male hand, Mr. Petty selected the EPA 50th percentile value of 990 cm² instead of the mean value of 840 cm² referenced by the EPA for assessing exposure of the hands to a chemical.[56]  By selecting the 50th percentile instead of the mean value in his calculation would result in an increase the dermal absorption or overestimate the absorption by the hands by approximately 18 percent.

### *Mr. Petty's Assumptions Regarding Mr. Knapper's Inhalation Exposure to Liquid Wrench*

When Mr. Petty calculated Mr. Knapper's inhalation exposure to Liquid Wrench, he calculated the exposure based upon all the benzene in the Liquid Wrench, less the amount dermally absorbed, being evaporated within the two hours plus timeframe for each event.

Mr. Petty assumed that the benzene concentration in the Liquid Wrench would remain at 5.4% for the first approximately 5 to 25 minutes during his dermal calculations and then would decrease based on his alpha (defined as an exponential evaporation rate constant used in Mr. Petty's average concentration formula) discussed above. In Mr. Petty's report, he stated, "During the application of products containing benzene, the benzene evaporates from application location within arms length of the worker's breathing zone." One cannot have a situation with both "no loss of benzene from the Liquid Wrench" while at the same time "having loss of benzene" when the liquid is evaporating from the equipment and from the hands.

Mr. Petty chose the radius of the near field hemisphere (or distance to the point of evaporation) to be 0.457 meters or approximately 18 inches based upon the plaintiff's testimony in Mr. Petty's telephone log. This value is uncharacteristically small and it is unrealistic to assume that Mr. Knapper's nose and mouth were within 18 inches of the application point of the Liquid Wrench for the entire two hour plus duration of exposure per event. Using Mr. Petty's arm's length for the radius of the hemisphere or distance from the application point would result in a conservative value of 30 inches.[57]  This corrected value for the radius resulted in a significant (approximately 60%) reduction in the airborne concentration of benzene in the near field and resulting cumulative dose.

Mr. Petty depicted the loss of benzene from Liquid Wrench as an exponential decay curve described earlier. Mr. Petty assumed that all the benzene evaporated from the Liquid Wrench in the two hour plus time frame described earlier. However, Mr. Petty lacked sufficient detail on the usage of Liquid Wrench by Mr. Knapper while he was working at the Citgo Service Station; when he worked at Jackson's Garage, when Mr. Knapper worked as a plumber's helper and plumber in New York and Texas; and when he rebuilt cars using Liquid Wrench in Texas and

---

55 Deposition of Ronald Coleman, taken 30 April 2009.

56 U.S. EPA, National Center for Environmental Assessment, Exposure Factors Handbook, August 1997.

57 Jurgens, H. W., et al., "International Data on Anthropometry," Occupational Safety and Health Series No. 65, 1990, pg. 22.

New York. In these cases, Mr. Petty assumed that an entire can evaporated in the two hour plus time frame for each use of Liquid Wrench. For example, based upon the testimony of Mr. Knapper, he would use a can of Liquid Wrench per week for all his work completed for the week. The actual amount of Liquid Wrench used per event or activity is unknown, therefore Mr. Petty's airborne exposure concentration calculation would not be representative of the actual airborne concentration for benzene that Mr. Knapper was exposed to during these activities.

The evaporation rate of benzene from the Liquid Wrench is dependant upon various factors defined above. Based upon the results of the study conducted by EPI to evaluate the evaporation rate of benzene from Liquid Wrench, the benzene would have completely evaporated in approximately 15 minutes or less after the product application.

Tables VII and VIII presents a summary of Mr. Petty's assumptions he used in his exposure assessment and the corrected value I used to assess Mr. Knapper's benzene exposures during his use of Liquid Wrench.

Summary Report
Lewis E. Knapper v. Radiator Specialty Company, et al.
EPI Project No. 29213
9 July 2009
Page 23

### Table VII: Plaintiff's Industrial Hygiene Expert Assumptions and Corrected Input Values
#### (Part 1: Dermal Exposure Factors)

| Category of Input Values | Petty Assumptions by Input Parameters | Corrected Values |
|---|---|---|
| Exposure duration per application/event | 5-25 min. + 120 min ≈ 125-145 min. Assumes right hand wet for entire time, left hand wet 50% of the time, wrists wet 25%-50% of the time plus face and forearms during some activities are wet. Based on telephone log with Mr. Knapper. | EPI Evaporation Rate Study concluded the benzene would be gone in 15 minutes after application. Therefore, 20 min. time assigned for dermal absorption. |
| Number of events | Used 100 events over a four year period for repair of motorcycles. | Mr. Knapper's deposition testimony taken 13 January 2009 page 41 stated he worked on 50 motorcycles in this time frame. |
| Surface area of skin | - Uses EPA 50th percentile surface area of male hand 990 cm$^2$<br>-Assumes all surface area contacted is immediately wet and stayed wet for entire event duration. | - EPA mean value for male hand is 840 cm$^2$ |
| Skin Absorption factor | Fingers, forearm, face, wrists = 1, Palms = 2 Federal Register. Assumes 1.5 for entire hand. | The palm represents 225 cm$^2$ of Mr. Petty's 990 cm$^2$ so the correct factor for the entire hand should be $\frac{(225 \times 2)+ (990-225) \times 1}{990} = 1.2$<br>However EPI used the same value as Mr. Petty - Susten 1985 identified the palmer surface area to be 225 cm$^2$.<br><br>Based upon Modjtahedi & Maibach, the ratio is 2:1 for pure benzene on palms. Rates for absorption of benzene through the skin are affected by the mixture. |
| Evaporation rate | Depicts benzene evaporating from crude oil and Liquid Wrench as an exponential decay curve. Averages the evaporation rates of benzene from crude oil and gasoline to derive evaporation constant for benzene in Liquid Wrench, used in dermal calculation.. Uses 5.4% for 5-25 min. exposure with no loss of benzene, then calculates average concentration over next two hours to be 3.1%. | Based upon EPI's Benzene Evaporation Rate Study, the average concentration of benzene in Liquid Wrench over 20 minutes was 1.04%. The evaporation of benzene would have been immediate, not delayed for 5-25 minutes. |
| Flux | 0.0542 mg/ cm$^2$-hr application time<br><br>0.03747 mg/ cm$^2$-hr Post application time | 0.019 mg/ cm$^2$-hr<br><br>This value was derived using Mr. Petty's flux equation |
| **Cumulative impact of corrected values reduces Mr. Petty's estimate by > 90% to 2.7 ppm-years** | | |

#### Table VIII: Plaintiff's Industrial Hygiene Expert Assumptions and Corrected Input Values
#### (Part 2: Inhalation Exposure Factors)

| Category of Input Values | Petty Assumptions or Input Parameters | Corrected Values |
|---|---|---|
| Generation rate | Petty states typically the time for the liquid (benzene from LW) to evaporate is equal to the activity time. It is conventional in exposure calculations to use 100% benzene mass evap. from LW during these NF exposure calculations. [Spencer 2007] | The assumption of all the benzene evaporation during the activity time is assuming a worst case scenario or maximum exposure. |
| Near Field Zone | Assumes arm's length for his near field radius factor of 18" or 1.5 feet or .46 meters<br>Near field volume = 0.20 m3<br>Surface area NF zone = 1.31m2<br>Vol. Flow in & out NF = 7.51m3/min<br>Assumes all the benzene in the Liquid Wrench evaporates within 2 hour plus time frame into the near field. | Per International Data on Anthropometry, the forward reach of the 5th percentile male was 2.6 feet.<br>Per Das and Grady, Industrial Workplace Layout Design, Table 2 the 50th percentile arm reach is 2.5 feet.<br>Near field volume = 0.93 m3<br>Surface area NF zone = 3.65m2<br>Vol. Flow in & out NF = 20.85 m3/min |
| Exposure Duration | Mr. Petty assumes that Mr. Knapper was within the near field for the entire duration of the exposure event for every event for his entire lifetime, e.g. 2+ hours. | Assuming Mr. Knapper was within the near field for the entire duration of the event for each and every event is unlikely and portrays a worst case scenario. |
| Number of events | Used 100 events over a four year period for repair of motorcycles. | Mr. Knapper's deposition testimony taken 13 January 2009 page 41 stated he worked on 50 motorcycles in this time frame. |
| Vapor emission rate | Assumes the dispensed amount or an entire can of Liquid Wrench is evaporated over the event time period. The total available mass of benzene is divided by the total time in minutes to develop a generation rate. | Mr. Petty did not know the actual time Mr. Knapper spent for each event or activity, Mr. Petty assumed a value of 2 hours plus application time. So the generation rate and resulting airborne concentration for benzene calculated by Mr. Petty is not relevant to Mr. Knapper's actual airborne concentration of benzene exposure. |
| Cumulative impact of corrected values<br>reduces Mr. Petty's exposure estimate by >60% to 0.8 ppm-years | | |

*Mr. Petty's Assumptions Regarding Mr. Knapper's Dermal Exposure to Safety-Kleen Solvent*

Mr. Petty assumed that the Exxon Varsol benzene concentrations are representative of the benzene concentration in the Safety-Kleen solvent during the time period that Mr. Knapper would have used the Safety-Kleen parts washers.

Mr. Petty assumed that each and every time Mr. Knapper used a Safety-Kleen parts washer, it contained 0.03% benzene (300 ppm), the level of benzene in fresh solvent based upon the Exxon Varsol data. Parts washer solvent was not replaced every day, but more likely every month or longer depending on usage rates. If the assumption was that solvent was replaced daily and that Mr. Knapper used the parts washer at some point during the day, the starting concentration, on average, based upon the benzene concentration assumed by Mr. Petty would have been 0.017%.

This is based upon the change in benzene concentration in the parts washer solvent over time. Mr. Knapper could have used the parts washer at anytime beginning in the morning to late in the day. The average concentration at t = four hours (half way through the day) would be 0.017% using the following formula and the half-life alpha derived from Fedoruk et al., (2003), the same alpha that Mr. Petty used in his calculations.[58,59]

$$C(t) = C(o) \times exp\ (-\alpha xt)$$

Table IX presents a summary of the assumptions Mr. Petty used in his exposure assessment and the corrected value I used to assess Mr. Knapper's benzene exposures during his use of Safety-Kleen Solvent.

**Table IX: Dermal Exposure Model Input Values used by Mr. Petty and Corrected Values for Safety-Kleen Solvents**

| Category of Input Values | Mr. Petty's values | Corrected values |
|---|---|---|
| Exposure Duration per job | For tank at Colintonio, Citgo Garage and ½ time at Jacksons Garage, assumed 3 hours wet time after removing hands from tank. | Unlikely for benzene to remain in residual solvent for 3 hours after removal from tank. No changes made in calculation. |
| Number of events | Colintonio, 31 events. Assumed used tank 1x/day for 4.17 wks/month x 1.5 months = 31 | Per deposition testimony of Mr. Knapper taken 13 January 2009, pgs.46-47, Mr. Knapper used the solvent tank 1x/week for 6.26 weeks per Petty calculation for total events of 6.26. |
| Surface area of skin in contact with LW | 990 cm² per hand | 840 cm² hand |
| Flux | 0.0019 mg/ cm²-hr while working in the tank<br><br>0.00168 mg/ cm²-hr after removing hands from tank | 0.00133 mg/ cm²-hr while working in the tank<br><br>0.00117 mg/ cm²-hr after removing hands from tank |
| Concentration of benzene in Liquid Wrench during exposure period | 0.03% first 30 minutes<br><br>0.0245% average last 180 minutes | 0.017 %* average for first 30 minutes,<br><br>0.014 %* for remaining time |
| **Cumulative impact of corrected values reduces Mr. Petty's exposure estimate by >60% to 0.4 ppm-years** | | |

*This value was derived using Mr. Petty's average concentration equation

---

[58] http://wikipedia.org/wiki/Exponential_decay

[59] Fedoruk, M. J., "Benzene Exposure Assessment for Use of a Mineral Spirits-Based Degreaser," Applied Occupational and Environmental Hygiene, 2003.

Mr. Petty did not conduct an inhalation exposure assessment regarding Mr. Knapper's alleged use of the Safety-Kleen product.

### EPI Exposure Assessment

Air monitoring for determination of employee exposure is presently the only method accepted by OSHA for evaluating compliance with occupational health standards.  When personal air monitoring data is not available for the individual, the use of data from co-workers or surrogate data from other operations may be used, with caution, to provide some basis for estimating potential exposures.  When air monitoring data is not available, then exposure estimates can be made by mathematical modeling.  A concern with relying on a model is its validation, which has been previously discussed.  The Near Field/Far Field Model has been validated in several studies which Mr. Petty used to calculate his estimate of Mr. Knapper's lifetime airborne exposure to Liquid Wrench.  The Dermal Flux Model however has not been validated.

If we proceed with Mr. Petty's approach to estimating Mr. Knapper's cumulative exposure to benzene using the Near Field/Far Field Model and the Dermal Flux Model but change the input parameters due to Mr. Petty's improper assumptions, we arrive at a radically different but more representative estimation of Mr. Knapper's cumulative exposure to benzene from use of Liquid Wrench and Safety-Kleen products.

### Mr. Knapper's Potential Exposure to Benzene from Liquid Wrench

Assuming that Mr. Petty's methodological approach to dermal and inhalation exposure to benzene in the Liquid Wrench was correct, and correcting the input parameters used by Mr. Petty that are incorrect, Mr. Knapper's dermal exposure would be approximately  2.7 ppm-years and the inhalation exposure would be approximately 0.8 ppm-years.

A second analysis was completed with only the exposure duration and flux changed (these values were changed based upon the EPI Evaporation Rate Study) in Mr. Petty's dermal and inhalation models.  The resulting dermal exposure would be approximately 3.0 ppm-years and the inhalation exposure would be approximately 2.3 ppm-years.

### Mr. Knapper's Cumulative Airborne Exposure Estimate to Benzene from  Liquid Wrench

The cumulative exposure to benzene in air from Liquid Wrench is based upon the following factors:

- Average concentration of benzene in the breathing zone of Mr. Knapper.
- Duration of exposure to that concentration in air.

The concentration in the near field (breathing zone) is defined by the radius of the near field, the air flow in and out of the near field and the amount of benzene released into the air per minute.  It is very unlikely that Mr. Knapper stayed within a half a meter of the Liquid Wrench wetted

materials for the two hour plus time frame for every event he completed in his entire working career and every event he completed in his leisure time. A more reasonable value to use as the radius in the Near Field model was the approximate length of the arm in front of the torso, or 2.5 feet (0.762 meters). As described by Mr. Petty, "During the application of products containing benzene, the benzene evaporates from application location within arms length of the worker's breathing zone." This is still a very conservative value and still assumes Mr. Knapper would have remained within this distance to the Liquid Wrench wetted surface for the entire time it took for all the non-absorbed benzene to evaporate. When the correct value for the radius of the near field is entered into the model and the maximum length of exposure time that Mr. Knapper potentially worked with raffinate containing Liquid Wrench, the resultant cumulative exposure is 0.8 ppm-years. Appendix VI contains the summary page of the spreadsheets used to calculate this cumulative inhalation exposure.

### Mr. Knapper's Cumulative Dermal Exposure Estimate to Benzene from Liquid Wrench and Safety-Kleen Solvent

The cumulative exposure to benzene on the skin from contact with Liquid Wrench according to Mr. Petty is determined by the following factors.

- The average concentration of benzene in the Liquid Wrench or Safety-Kleen solvent over the contact period of time
- The surface area of skin contacted
- The location of the skin contacted e.g. fingers vs. palm
- The exposure duration

The average concentration of benzene in the Liquid Wrench over the 20 minute time period would be 1.04 %; the surface area of the skin contacted for the hands would be 150 cm$^2$ less per whole hand; Mr. Petty's skin factor of 1.5 was used for the hands (Mr. Petty assumed a 1.5 factor based upon the combination of absorption through the palm - absorption factor of two and through the other parts of the hand - absorption factor of one); and the duration of contact where benzene could be absorbed would be 20 minutes per event. When considering these values and the adjusted flux based upon benzene concentration using Mr. Petty's formula below, and the maximum length of exposure time that Mr. Knapper potentially worked with raffinate containing Liquid Wrench, the resultant cumulative exposure would be 2.7 ppm-yrs. Appendix VII contains the summary page of the spreadsheets used to calculate this cumulative dermal exposure.

$$\text{Flux} = 0.0183 \, (\% \text{ benzene})^{0.6435} \qquad \text{(Petty formula)}$$

$$= 0.019 \text{ mg/ cm}^2\text{-hr}$$

The average starting concentration of benzene in the Safety-Kleen solvent assuming the tank is filled with fresh solvent each day is 0.017% and 0.014% over the next three hours. The surface area of the skin contacted for the hands would be 150 cm$^2$ less per whole hand. Mr. Petty's skin factor of 1.5 was used for the hands, and the duration of contact where benzene could be absorbed would be 30 minutes in the tank and 180 minutes after removing the hands from the tank. When considering these values and the adjusted flux based upon benzene concentration using Mr. Petty's formula below, the resultant cumulative exposure would be 0.4 ppm-yrs.

Appendix VIII contains the summary page of the spreadsheets used to calculate this cumulative dermal exposure.

$$\text{Flux} = 0.0183 \, (\% \text{ benzene})^{0.6435} \qquad \text{(Petty formula)}$$

$$= 0.017 \text{ mg/ cm}^2\text{-hr and } 0.014 \text{ mg/ cm}^2\text{-hr}$$

The exposure values derived by EPI are believed to be reasonable upper bound estimates based on the testimony, scientific literature, and the use of Mr. Petty's methodology. Additional factors not considered in the upper bound estimates that would reduce these estimates even further would include the following:

- If dermal contact was not immediate after the dispensing of the Liquid Wrench.

- If the total surface area estimated by Mr. Petty was not wetted immediately upon the dispensing of the Liquid Wrench but occurred during the removal and handling of the work pieces.

- If Mr. Knapper used a rag to wipe the Liquid Wrench off of his hands after dermal contact with the Liquid Wrench.

- If some of the Liquid Wrench used by Mr. Knapper was the non-raffinated version of Liquid Wrench.

- If the solvent in the Safety-Kleen tanks was not changed on a daily basis, but on the more likely monthly schedule.

### Conclusions

Based on my review of documents and scientific literature to date, my review of Mr. Knapper's work history as described in his testimony, and on my professional experiences, it is clear to me that the airborne concentration of benzene vapor, if any, from the use of Liquid Wrench and Safety-Kleen Solvent would not have exceeded the OSHA-PEL or 15-minute STEL at the time of the product use.

1. Using the plaintiff's industrial hygiene expert's methodology for determining inhalation exposure resulted in a cumulative inhalation dose to benzene-containing Liquid Wrench of 0.8 ppm-yrs. The cumulative exposure was well below the health standards of the day and even current day standards.
2. The plaintiff's industrial hygiene expert's methodology for determining dermal dose has not been scientifically validated, is not reliable, nor is it a standard and acceptable industrial hygiene practice for quantifying dermal dose.
3. When developing the occupational health standards and guidelines, OSHA and other standard and guidelines setting agencies accounted for the dermal route of exposure and used the inhalation route of exposure as the surrogate for both dermal and inhalation exposures.

4. The Liquid Wrench product labels met the requirements of the FHSA regulations during the period of time from 1960 to 1978 and conveyed the necessary information for Mr. Knapper to properly manage the hazards of the product.

My opinions are based on my more than 32 years of experience as an industrial hygienist and safety professional. My experience has included health hazard evaluations and audits of multiple operations within facilities similar to and the same as those workplaces experienced by Mr. Knapper. My experience has also included the development of exposure assessment strategies, and training of employees who worked in numerous industrial operations. I also base my opinion upon portions of the scientific literature focused on occupational health hazard assessment.

To date, the following materials have been reviewed and/or relied upon specifically for this case.

### References:

1. Complaint
2. Product Date First Sold [RSC 00186 - RSC 00187]
3. Mulhausen, John R. and Joseph Damiano. A Strategy for Assessing and Managing Occupational Exposures, 2nd Ed. American Industrial Hygiene Association, Fairfax, VA 1998 and DiNardi, SR. The Occupational Environment – Its Evaluation and Control. AIHA Press, Fairfax, VA 1997.
4. Viet SM, Stenzel MR, Rennix CP, and Arnstrong TW. AIHA Guideline 11 – 2008 Guideline on Occupational Exposure Reconstruction. American Industrial Hygiene Association, Fairfax, Virginia. 2008.
5. Esmen N.A. "Retrospective Industrial Hygiene Surveys" Am. Ind. Hyg. Assoc. J. 40 (1979): 58-65.
6. Checkaway et al., Industrial Hygiene Involvement in Occupational Epidemiology, Am. Ind. Hyg. Assoc. J. 48 (1987) 515-523.
7. Baumgarten M, J. Siemiatycki, G. Gibbs, Validity of Work Histories Obtained by Interview for Epidemiologic Purposes, Am. J. Epidem. 118 (4) 1983.
8. Denis Hemon, et al. Retrospective Evaluation of Occupational Exposures in Cancer Epidemiology: A European Concerted Action of Research, Appl. Occup. Environ. Hyg. 6 (6) 1991.
9. Nicas M, Plisko MJ, and Spencer JW. "Estimating Benzene Exposure at a Solvent Parts Washer." Journal of Occupational and Environmental Health 3(2006): 284-291.
10. Spencer, John W. and Plisko, Marc J. 'A Comparison Study Using a Mathematical Model and Actual Exposure Monitoring for Estimating Solvent Exposures During the Disassembly of Metal Parts', Journal of Occupational and Environmental Hygiene, 4 (2007): 253 – 259.
11. Plisko M and Spencer JW. "Evaluation of a mathematical model for estimating solvent exposures in the workplace." JCHAS (2008):
12. NIOSH Manual of Analytic Methods is available at http://www.cdc.gov/niosh/nmam/ and includes validated sampling and analytical methods. OSHA validated sampling and

Summary Report
Lewis E. Knapper v. Radiator Specialty Company, et al.
EPI Project No. 29213
9 July 2009
Page 29

analytical methods are available at http://www.osha.gov/dts/sltc/methods/index.html.
Information regarding limit of detection, range, and precision; i.e. sampling and analytical
error is provided for validated NIOSH and OSHA methods.

13. ibid.

14. OSHA. "Dermal Dosimetry" http://www.osha.gov/SLTC/dermalexposure/dosimetry.html

15. Fiserova-Bergerova V. "Letter to the Editor: RE: Response to Bunge's Letter to the
    Editor." American Journal of Industrial Medicine 34 (1998): 91.

16. Jakasa I and Kezic S. "Evaluation of in-vivo animal and in-vitro models for prediction of
    dermal absorption in man." Human & Experimental Toxicology 27 (2008): 281-288.

17. Blank, I.H., and D. J. McAuliffe. "Penetration of Benzene through Human Skin." J.
    Invest. Dermatol, 85 (1985): 522-526.

18. Franz, TJ. Chapter 5 "Percutaneous Absorption of Benzene." In Advances in Modern
    Environmental Toxicology. Volume VI – Applied Toxicology of Petroleum
    Hydrocarbons. Editors: MacFarland, Holdsworth, MacGregor, Call, and Lane. Princeton
    Scientific Publications, Inc. 1984: 61-70.

19. Hanke, J., T. Dutkiewicz, and J. Piotrowski. 1961. "The Absorption of Benzene through the Skin
    in Man." Med. Pracy, 12 (1961): 413-426. (OSHA translation and reprint with permission in
    International Journal of Occupational and Environmental Health, 6 (2000): 104-111.)

20. Loden, M. "The in vitro Permeability of Human Skin to Benzene, Ethylene Glycol,
    Formaldehyde, and n-Hexane." Acta Pharmacol. et Toxicol., 58 (1986): 382-389.

21. Adami, et al. "Penetration of benzene, toluene and xylenes contained in gasolines through
    human abdominal skin in vitro." Toxicology in Vitro 20-8 (2006): 1321-1230.

22. Blank and McAuliffe 1985.

23. Blank and McAuliffe 1985.

24. Bowman A and Maibach HI. "Influence of evaporation and solvent mixtures on the
    absorption of toluene and n-butanol in human skin in vitro." Annals of Occupational
    Hygiene 44-2 (2000): 125-135.

25. Riviere, JE and Brooks, JD. "Prediction of dermal absorption from complex chemical
    mixtures: incorporation of vehicle effects and interactions into a QSPR framework." SAR
    and QSAR in Environmental Research, 18 (2007):1, 31 — 44.

26. Fiserova-Bergerova V. "Relevance of occupational skin exposure." Annals of
    Occupational Hygiene 37 (1993): 673-685. p. 677

27. Franz, TJ. Chapter 5 "Percutaneous Absorption of Benzene." In Advances in Modern
    Environmental Toxicology. Volume VI – Applied Toxicology of Petroleum
    Hydrocarbons. Editors: MacFarland, Holdsworth, MacGregor, Call, and Lane. Princeton
    Scientific Publications, Inc. 1984: 61-70.

28. Bowman and Maibach 2000.

29. OSHA Preamble to the Benzene Standard. Federal Register 52(176): September 11,
    1987; pp. 34487-34505.

30. Deposition of Lewis Knapper taken 13-14 January 2009

31. Mr. Petty's Outline of Opinions Report, Appendix B, Mr. Lewis E. Knapper Telephone
    Log Sheet

32. Deposition Testimony of Mr. Knapper taken 13 January 2009, pp 23-26.

33. Safety Data Sheet for Raffinate, USS Chemicals, 1967.

34. Table P-4 Typical Analysis of Clairton Raffinate [USS 09 – USS 10], and Appendix No.
    2 to LR-09A "Liquid Wrench No.1 [RSC 00025]

35. Product label exhibit 17 Wells deposition

36. Table I (Attachment to LR-09-A) Properties of raffinate (D-3) [Bate #RSC00023]

37. Appendix No. 2 to LR-09A: Liquid Wrench No. 1, Formulas in %/Weight [Bate # RSC00160]

38. Deposition of James Wells, taken 7 December 2006

39. 1960 U.S.C.C.A.N. 2833 P.L. 86-613, Federal Hazardous Substances Labeling Act. Food and Drug Administration (1964) Title 21 Subchapter D – Hazardous Substances Part 191 – Hazardous Substances: Definitions and procedural and interpretive regulations. Title 21 Code of Federal Regulations 1964. Pages 1085-1105. Food and Drug Administration. (1964) "Benzene, Petroleum Distillates, Toluene, Xylene; Labeling Requirements." Title 21 Subchapter D – Hazardous Substances Part 191 – Hazardous Substances: Definitions and procedural and interpretive regulations. Federal Register, Thursday, February 6, 1964: 1802-1803. Food and Drug Administration (1966) Title 21 Subchapter D – Hazardous Substances Part 191 – Hazardous Substances: Definitions and procedural and interpretive regulations. Title 21 Code of Federal Regulations 1966. Pages 747-772. Radiator Specialty Company "RSC Photos – 00001"

40. FHSLA 1960. 1960 U.S.C.C.A.N. 2833 P.L. 86-613, Federal Hazardous Substances Labeling Act.

41. Keil, C. B., "Mathematical Models for Estimating Occupational Exposure to Chemicals," AIHA, 2000 pg 53.

42. Hanke et al. 1961.

43. Fiserova-Bergerova V and Pierce JT. "Biological Monitoring V: Dermal Absorption." Applied Industrial Hygiene, 4 (1989): F-14 - F-21.

44. Blank, I.H., and D. J. McAuliffe. "Penetration of Benzene through Human Skin." J. Invest. Dermatol, 85 (1985): 522-526.

45. Susten, et. al. "Percutaneous Penetration of Benzene in Hairless Mice: an Estimate of Dermal Exposure During Tire Building Operations." American Journal of Industrial Medicine, 7 (1985): 323-335.

46. Adami, et al. "Penetration of benzene, toluene and xylenes contained in gasolines through human abdominal skin in vitro." Toxicology in Vitro, 20 (2006): 1321-1230.

47. Franz, p. 70.

48. Loden, M. "The in vitro Permeability of Human Skin to Benzene, Ethylene Glycol, Formaldehyde, and n-Hexane." Acta Pharmacol. et Toxicol., 58 (1986): 382-389.

49. Golub, Gene; Charles F. Van Loan (1996). Matrix Computations - Third Edition. Baltimore: The Johns Hopkins University Press. pp. 53.

50. Affidavit of James D. Wells, signed 14 October 2008.

51. Deposition of Lewis Knapper, taken 14 January 2009, pgs. 82-84.

52. Mr. Petty obtained an exponential evaporation rate constant, α, from averaging the evaporation rate he obtained from benzene evaporating from crude oil and the evaporation rate of gasoline.

53. Deposition of Robert Burton, taken 19 Sept 2008 and Deposition of Edson Burnham, taken 2 Oct 2008 in the Robert B. Oakley and Irene Oakley v. Radiator Specialty, Case Number 2:07-CV-00351.

54. Deposition of Lewis Knapper, taken 13 January 2009, pgs. 24-26.

55. Deposition of Ronald Coleman, taken 30 April 2009.

56. U.S. EPA, National Center for Environmental Assessment, Exposure Factors Handbook, August 1997.

57. Jurgens, H. W., et al., "International Data on Anthropometry," Occupational Safety and Health Series No. 65, 1990, pg. 22.

58. Exponential Decay equation: http://wikipedia.org/wiki/Exponential_decay

59. Fedoruk, M. J., "Benzene Exposure Assessment for Use of a Mineral Spirits-Based Degreaser," Applied Occupational and Environmental Hygiene, 2003.


### Additional Resources and References:

60. Radiator Specialty Company. "Material Safety Data Sheet." [RCS 000158]

61. Various product labels and Material Safety Data Sheets for Liquid Wrench.

62. "Benzene Content of Petroleum Solvents," *AMA Archives of Industrial Health,* 13 (1956): 51-54.

63. "Criteria for a recommended standard.... Occupational Exposure to Toluene," U.S. Department of Health, Education, and Welfare, 1973.

64. "Odor Thresholds for Chemicals with Established Occupational Health Standards," American Industrial Hygiene Association, Fairfax, VA, 1989.

65. "Toxicology and Biochemistry of Aromatic Hydrocarbons," Horace W. Gerarde, MD, PhD, 1960.

66. *A Toolbox of Mathematical Models for Occupational Exposure Assessment,* Professional Development Course 401, American Industrial Hygiene Conference and Exposition, Atlanta, GA, May 1998.

67. ACGIH TLV Committee. "Benzene." Documentation of the TLVs and BEIs. ACGIH Press, Akron, Ohio (2001) pp Benzene BEI -1 to 14.

68. AIHA Exposure Assessment Strategies Committee Modeling Subcommittee. Mathematical Models for Estimating Occupational Exposure to Chemicals. Charles Keil, Editor. AIHA Press, 2000. pp. 65-75.

69. American Conference of Governmental Industrial Hygienists (ACGIH), Threshold Limit Values, 1946 to present.

70. API Toxicological Review, Benzene, September 1948, American Petroleum Institute

71. Arfsten, et al. "Characterization of the skin penetration of hydrocarbon-based weapons maintenance oil." *Journal of Occupational and Environmental Hygiene,* 3 (2006): 457-464.

72. Beamer P, Canales R, and Leckie, JO. "Developing probability distributions for transfer efficiencies for dermal exposure. *Journal of Exposure Science and Environmental Epidemiology,* 2008:1-10.

73. Benzene (Benzol) Data Sheet, Published by National Safety Council, 1950.

74. Beverly KJ, Clint JH, and Fletcher PDI. "Evaporation rates of structured and non-structured liquid mixtures." *Phys Chem Chem Phys* 2 (2000): 4173-4177.

75. Boeniger, MF and Lushniak, BD. "Exposure and absorption of hazardous materials through the skin." *International Journal Occupational and Environmental Health,* 6 (2000): 148-150.

76. Boman, A. and Maibach, H.I. "Influence of Evaporation and Solvent Mixtures in the Absorption of Toluene and n-butanol in Human Skin in vitro." *Annals of Occupational Hygiene,* **44** (2000): 125-135.

77. Boogaard PJ and van Sittert NJ. "Exposure to polycyclic aromatic hydrocarbons in petrochemical industries by measurement of urinary 1-hydroxypyrene. *Occupational and Environmental Medicine* **51** (1994): 250-258.

78. Brenner D, Kalnas J, and Teitelbaum DT. "Skin absorption of benzene as a contaminant in other solvents." *Eur J Oncol* **3** (1998): 399-405.

79. Brief, Richard S., et al. "Benzene in the workplace," *American Industrial Hygiene Association Journal* **41**(1980):616-623.

80. Code of Federal Regulations, 29 CFR Part 1910.

81. Code of Federal Regulations, 46 CFR Part 172.101.

82. Conrad, R.G. and Soule, R.D. 1997. "Principles of Evaluating Worker Exposure." In The Occupational Environment -- Its Evaluation and Control. Salvatore R. DiNardi, eds. Fairfax, Virginia: AIHA Press. pp. 105-129.

83. Das B and Grady RM. "Industrial workplace layout design: An application of engineering anthropometry." *Ergonomics* **26** (1983). P. 439 (Table 2)

84. Deposition of Linda Knapper, taken 13 Jan 2009 w/exhibits

85. Deposition of Frank Ake, taken 8 Aug 2005 w/exhibits (Atkins)

86. Deposition of James Graeber, taken 14 Sept 2005 (Atkins)

87. Deposition of John Masaitis, taken 14 Sept 2005 (Atkins)

88. Deposition of Louise Armstrong, taken 12 Aug 1999 (Green)

89. Deposition of Alan Blumenthal, taken 4 Dec 2003 (Cowey)

90. Depositions of James D. Wells,
    i. Taken 7 Oct 2005 (Atkins)
    ii. Taken 8 Oct 2004 (Boren)
    iii. Taken 6 Oct 2004 (Bushnell)
    iv. Taken 30 Oct 2003 (Cowey)
    v. Taken 4 Dec 2003 (Cowey)
    vi. Taken 7 Dec 2006 (Diorio)
    vii. Taken 16 Feb 2000 (Green)
    viii. Taken 25 Jan 2001 (Gregory) Volumes I & II
    ix. Taken 10 March 1998 (Limon)
    x. Taken 6 Nov 2008 (Oakley) Volumes I & II

91. Elkins HB, Comproni EM, and Pagnotto L, *Industrial Benzene Exposure from Petroleum Naphtha: II. Pertinent Physical Properties of Hydrocarbon Mixtures,* Industrial Hygiene Journal, March-April 1963, pp. 99-102.

92. Glass et al. "Retrospective Exposure Assessment for Benzene in the Australian Petroleum Industry. *Annals of Occupational Hygiene,* **44** (2000): 301-320. Dermal paragraph 307.

93. Hall, SK, Chakraborty, Ruch, RJ. Editors. Chemical Exposure and Toxic Responses. CRC Press, Boca Raton; 1997. pp 251-252.

94. Hawkins, Neil C., et al., A Strategy for Occupational Exposure Assessment, American Industrial Hygiene Association, Fairfax, VA 1991. p.2.

95. Henshaw, J. L. et al, "The Employer's Responsibility for Maintain a Safe and Healthful Work Environment; An Historical Review of Societal Expectations and Industrial Practices." Employ Response Rights J, June 2007.

96. Industrial Hygiene Bulletin, Safety Data Sheet, Benzene

97. Interaction Profile for Benzene, Toluene, Ethyl benzene, and Xylene (BTEX), US Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry, Atlanta, GA 2002.

98. Klassen, Curtis D., Casarett and Doull's Toxicology, The Basic Science of Poisons, Fifth Edition, McGraw-Hill, New York, NY, 1996.

99. Knapper Medical Records

100. Knapper Employment Records from William R. Nash Inc.

101. Korinth et al. "Discrepancies between different rat models for the assessment of percutaneous penetration of hazardous substances." *Arch Toxicol,* 81(2007): 833-840.

102. Leung H-W and Paustenbach DJ. "Techniques for estimating the percutaneous absorption of chemicals due to occupational and environmental exposure." *Applied Occupational and Environmental Hygiene* 9 (1994): 187-197.

103. Liquid Wrench Documents: DEOD00001-393; RSC 00001-00263; LWTEST 0001-0010; RSC-IT 00001-00071; RSC Plant 0001-0002; RSC-RespProt 00001-00004; RSC-VM 0003-0006; RSC II 0001-0119; HB00001-00046; RAFF00001-00048; RSC Photos -- 00001-00064; RSC00264-00843.

104. Maibach, H. I., and D.M. Anjo. "Percutaneous penetration of benzene and benzene contained in solvents used in the rubber industry." *Archives of Environmental Health* 36-5 (1981): 256-260.

105. McDougal, J.N. et al. "Dermal Absorption of Organic Chemical Vapors in Rats and Humans." *Fundamental and Applied Toxicology,* 14 (1990): 299-308.

106. Modjtahedi BS and Maibach HI. "*In vivo* percutaneous absorption of benzene in man: Forearm and palm." *Food and Chemical Toxicology* 46 (2008): 1171-1174.

107. Nakai, J.S. et al. "Effect of Environmental Conditions on Penetration of Benzene through Human Skin." *Journal of Toxicology and Environmental Health,* 51 (1997): 447-462.

108. National Institute for Occupational Safety and Health (NIOSH). 1998. NIOSH Manual of Analytical Methods. 4th Edition. (DHHS/NIOSH Pub. No. 98-119.) Cincinnati: National Institute for Occupational Safety and Health.

109. National Institute for Occupational Safety and Health, Criteria for a Recommended Standard, Benzene, 1974, 1976.

110. Neumann, D. and Kimmel Carole, CA. Human Variability in Response to Chemical Exposures. International Life Sciences Institute. CRC Press, Boca Raton, 1998. p. 8.

111. Nicas M and Neuhaus J. "Predicting Benzene Vapor Concentrations with a Near Field/Far Field Model." *Journal of Occupational and Environmental Hygiene,* 5 (2008): 599-608.

112. Nicas M, Plisko MJ, and Spencer JW. "Estimating Benzene Exposure at a Solvent Parts Washer." *Journal of Occupational and Environmental Health* 3(2006): 284-291.

113. Nicas, M. "Chapter 8: Two Zone Model" in Keil CB editor. Mathematical Models for Estimating Occupational Exposure to Chemicals. AIHA Exposure Assessment Strategies Committee, Modeling Subcommittee. AIHA Press, Fairfax, Virginia. 2000.

114. Nicas, M. "Using mathematical models to estimate exposure to workplace air contaminants." *Chemical Health and Safety* (January/February 2003): 14-21.

115. Nicas, M., "Estimating exposure intensity in an imperfectly mixed room." AIHAJ 57:542-500, 1996.

116. Nies, E and Korinth, G. Commentary on "Penetration of benzene, toluene and xylenes contained in gasolines through human abdominal skin in vitro." *Toxicology In Vitro*, 22 (2008): 275-7.

117. NIOSH Manual of Analytic Methods is available at http://www.cdc.gov/niosh/nmam/ and includes validated sampling and analytical methods. OSHA validated sampling and analytical methods are available at http://www.osha.gov/dts/sltc/methods/index.html. Information regarding limit of detection, range, and precision; i.e. sampling and analytical error is provided for validated NIOSH and OSHA methods.

118. NOVA Chemicals. "Benzene Material Safety Data Sheet" MSDS ID: NOVA-001. p 8.

119. OSHA Preamble to the Benzene Standard. Federal Register 52(176): September 11, 1987; pp. 34487-34505.

120. OSHA Record H-059A 1978.

121. OSHA. "Dermal Dosimetry" *http://www.osha.gov/SLTC/dermalexposure/dosimetry.html*

122. Pagnotto et al., "Industrial Benzene Exposure from Petroleum Naphtha: I. Rubber Coating Industry." *American Industrial Hygiene Association Journal*, 22(1961):. 417-421.

123. Paustenbach DJ, Gaffney SH, Scott PK, Brown JL, and Panko JM. "High background levels of urinary benzene metabolites found in a volunteer study." *Journal of Occupational and Environmental Hygiene* 4 (2007): D71-D77.

124. "Physiological Properties, Benzene", Correspondence from W.E. Kuhn, 6/24/1953

125. Plaintiff's First Supplemental Case Specific Disclosures

126. Documents Produced in Plaintiff's Additional Disclosures

127. Plaintiff's Notice of Initial Disclosures

128. Plaintiff's First Supplemental Case Specific Disclosures

129. Plaintiff's Notice of Disclosures

130. Plaintiff's Notice of Supplemental Disclosures

131. Plaintiff's Additional Disclosures

132. Plaintiff's Initial Disclosures

133. Plaintiff's Designation of Expert Witnesses w/exhibits

134. Plisko M and Spencer JW. "Evaluation of a mathematical model for estimating solvent exposures in the workplace." *JCHAS* (2008):

135. Plog, Barbara, A., Fundamentals of Industrial Hygiene, Third Edition, National Safety Council, Chicago, IL, 1988.

136. Ross, et al. "Comparative evaluation of absorbed dose estimates derived from passive dosimetry measurements to those derived from biological monitoring: Validation of exposure monitoring methodologies. *Journal of Exposure Science and Environmental Epidemiology* 18(2008): 211-230.

137. Safety-Kleen Document Production SK000001-123.

138. Sahmel J, Boeniger, M, and Fehrenbacher, C. "Appendix II Dermal Exposure Assessments." In A Strategy for Assessing and Managing Occupational Exposures. Edited by Ignacio J and Bullock WH. AIHA Press, Fairfax, Virginia; 2006. p. 316.

139. Sahmel, J. Presentations at the American Industrial Hygiene Conference and Exhibition. 4 June 2008. Minneapolis, MN.

140. Semple, S. "Dermal Exposure to Chemicals in the Workplace: Just how important is skin absorption? *Occupational and Environmental Medicine*, 61 (2004): 376-382.

141. Spencer, J. "Exposure Assessment: An Evaluation of Benzene from the Application and Use of a Prepared Liquid Wrench Solvent in Static Environmental Conditions." EPI Study Report, 27 September 2002.

142. Susten AS, Dames, BL, and Niemeirer RW. "*In vivo* Absorption Studies of Volatile Solvents in Hairless Mice. I Description of a Skin-Depot." *Journal of Applied Toxicology*, 6 (1986): 43-46.

143. US Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry (ATSDR), Toxicological Profile for Benzene, Atlanta, GA 1997.

144. U.S. Department of Labor, Occupational Safety and Health Administration (OSHA). 29 CFR 1910.1028 and 29 CFR 1910.1200

145. U.S. Department of Labor, OSHA preamble to the benzene standard, FR 43 (29), February 10, 1978: 5948-5949.

146. U.S. Environmental Protection Agency. "Dermal Exposure Assessment: A summary of EPA Approaches. September 2007. EPA 600/R-07/040F. p. 34.

147. U.S. Environmental Protection Agency. Exposure Factors Handbook. Volume I – General Factors August 1996.

148. U.S. Environmental Protection Agency. Exposure Factors Handbook. Volume I – General Factors. EPA/600/P-95/002Fa. August 1997.

149. U.S. Environmental Protection Agency. Risk Assessment Guidance for Superfund – Volume 1 – Human Health Evaluation Manual (Part E, Supplemental Guidance for Dermal Risk Assessment), EPA/540/R99/005. July 2004.

150. U.S. Environmental Protection Agency. Risk Assessment Guidance for Superfund – Volume 1 – Human Health Evaluation Manual (Part E, Supplemental Guidance for Dermal Risk Assessment), EPA/540/R99/005. July 2004, p. 5-4.

151. Van de Sandt, JJM, Dellarco, M, and van Hemmen JJ. "From dermal exposure to internal dose." *Journal of Exposure Science and Environmental Epidemiology*, 17 (2007): S38-S47.

152. van Hemmen et al. RiskofDerm: Risk assessment of occupational dermal exposure to chemicals. An introduction to a series of papers on the development of a toolkit. *Annals of Occupational Hygiene*, 47(8): 595-598, 2003.

153. Various occupational safety and health publications and articles developed by government agencies, professional and trade associations, voluntary consensus standards organizations, and researchers.

154. Various state and federal occupational safety and health legislation and/or regulations.

Summary Report
Lewis E. Knapper v. Radiator Specialty Company, et al.
EPI Project No. 29213
9 July 2009
Page 36

155. Williams, et al. "Airborne Concentrations of Benzene Associated with the Historical Use of Some Formulations of Liquid Wrench." *Journal of Occupational and Environmental Hygiene* 4 (2007): 547-561.

156. Williams-Steiger Occupational Safety and Health Act of 1970 (OSHAct), paragraph 4 (b)(1).

My report is based on the information available to me at this time. Should additional information become available, I reserve the right to determine the impact, if any, of the new information on my opinions and conclusions, and to revise my opinions and conclusions if necessary.

Sincerely,

John W. Spencer, CIH, CSP
President

JWS/ddj

Appendices:

APPENDIX I:     Curriculum vitae John W. Spencer, CIH, CSP
APPENDIX II:    Benzene Dermal Flux Data for Various Liquid Mixtures Containing Variable Benzene Levels
APPENDIX III:   "Exposure Assessment: An Evaluation of Benzene from the Application and Use of a Prepared Liquid Wrench Solvent in Static Environmental Conditions."
APPENDIX IV:    Summary Report: "Determination of Evaporation Rates for a Benzene-Containing Solvent Mixture"
APPENDIX V:     Comparison of the values Mr. Petty's equation yielded values experimentally derived values
APPENDIX VI:    Summary of EPI spreadsheets used to calculate Mr. Knapper's estimated cumulative inhalation exposure
APPENDIX VII:   Summary of EPI spreadsheets used to calculate Mr. Knapper's estimated cumulative dermal exposure to Liquid Wrench.
APPENDIX VIII:  Summary of EPI spreadsheets used to calculate Mr. Knapper's estimated cumulative dermal exposure to Safety-Kleen solvents.